ANTHONY ALEXIS, DC Bar # 384545
Email: Anthony.Alexis@cfpb.gov
Phone: 202-435-7999
ORI LEV, DC Bar # 452565
Email: Ori.Lev@cfpb.gov
Phone: 202-435-7164
FRANK KULBASKI, DC Bar # 438917
Email: Frank.Kulbaski@cfpb.gov
Phone: 202-435-7260
RINA TUCKER HARRIS, DC Bar #444550
Email: RinaTucker.Harris@cfpb.gov
Phone: 202-435-9196
BRANDIS C. ANDERSON, CA Bar # 261325
Email: Brandis.Anderson@cfpb.gov
Phone: 202-435-7548
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
Fax: (202) 435-7722

Attorneys for Plaintiff
Consumer Financial Protection Bureau

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

| | |
|---|---|
| Consumer Financial Protection Bureau,<br><br>Plaintiff,<br><br>v.<br><br>IrvineWebWorks, Inc. d/b/a Student Loan Processing.US, a California corporation; and James Krause, an individual;<br><br>Defendants. | Case No. 8:14-cv-1967<br><br>**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER RELIEF** |

The Consumer Financial Protection Bureau ("Bureau") alleges the following against IrvineWebWorks, Inc. d/b/a Student Loan Processing.US and James Krause (collectively, "Defendants"):

**JURISDICTION AND VENUE**

1. This Court has subject-matter jurisdiction over this action because it is "brought under Federal consumer financial law," 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

2. Venue is proper in this district because Defendants are located, reside, and do business in this district, and because a substantial part of the events or omissions giving rise to the claims occurred in this district. 28 U.S.C. § 1391(b); 12 U.S.C. § 5564(f).

**INTRODUCTION**

3. The Bureau brings this action under the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. §§ 5531, 5536(a), 5564, 5565, and the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6102(c)(2) , 6105(d), and its implementing regulation, the Telemarketing Sales Rule ("TSR"), 16 C.F.R. part 310, based on misrepresentations connected to the Defendants' marketing and sale of student loan debt relief services and the charging of advance fees. The Bureau seeks to obtain permanent injunctive relief, civil money penalties, and other relief as set forth below.

**PLAINTIFF**

4. The Bureau is an independent agency of the United States charged with regulating the offering and provision of consumer financial products and services under Federal consumer financial laws, including the CFPA and the TSR. 12 U.S.C. §§ 5481(14), 5491(a), 5531(a); 15 U.S.C. § 6105(d). The Bureau has

independent litigating authority to enforce Federal consumer financial laws. 12 U.S.C. §§ 5564(a), (b); 15 U.S.C. § 6105(d).

**DEFENDANTS**

5. Defendant IrvineWebWorks, Inc. d/b/a Student Loan Processing.US ("Student Loan Processing.US") is a California corporation headquartered at 42 South Peak Drive in Laguna Nigel, California. Student Loan Processing.US maintains an office in Lake Forest, California and Dallas, Texas. Founded in May 2011, Student Loan Processing.US provides, or purports to provide, advice and assistance to student loan borrowers applying for U.S. Department of Education federal student loan repayment programs, including Direct Consolidation Loans and the Income-Based Repayment Plan. These services are "financial advisory services" to assist borrowers with student loan debt management, which are consumer financial services under the CFPA. 12 U.S.C. § 5481(15)(A)(viii); 5481(5). Student Loan Processing.US is therefore a "covered person" under the CFPA. 12 U.S.C. § 5481(6).

6. Defendant James Krause is the founder, president, and sole owner of Student Loan Processing.US. Krause has substantial managerial responsibility for and daily control over the operations of Student Loan Processing.US, including sales, onboarding, training, communications, compliance, as well as Student Loan Processing.US's policies and procedures. Krause is therefore a "related person" under the CFPA, and is a "covered person" under the CFPA. 12 U.S.C. § 5481(25)(C)(i).

**FACTS**

**U.S. Department of Education Repayment Programs**

7. The U.S. Department of Education offers numerous repayment plans to eligible borrowers with federal student loans, which are designed to help borrowers manage their student loan debt and make repayment of student loans

more affordable. These plans include its Graduated Repayment Plan, Income-Based Repayment Plan, and Pay As You Earn Repayment Plan. The amount the borrower will pay and the repayment term can vary depending on the repayment plan in which the borrower enrolls.

8. To access certain repayment plans, some borrowers will first combine their multiple eligible federal student loans into a single Direct Consolidation Loan. Eligible borrowers can apply electronically for a Direct Consolidation Loan through the U.S. Department of Education's website at www.StudentLoans.gov or by mailing a completed paper application to the U.S. Department of Education.

9. The U.S. Department of Education does not charge borrowers any fee to apply for a Direct Consolidation Loan or any U.S. Department of Education repayment plan or program.

**Defendants' Student Loan Debt Relief Services**

10. Since at least July 2011 through the present (the "relevant time period"), Defendants have marketed and advertised for-cost services to advise and assist student loan borrowers applying for U.S. Department of Education federal student loan repayment programs, including the Income-Based Repayment Program, and Direct Consolidation Loans.

11. Claiming to be a "consultation service" that works with the U.S. Department of Education, Defendants claimed to offer borrowers an "affordable way to make [their] Federal Student Loan debt more flexible and easy to manage." Defendants also claimed to "work directly with your lenders, consolidate your Federal Student Loan with the Department of Education, and help you obtain one LOW monthly payment to save you thousands of dollars."

12. In exchange for an upfront enrollment fee and recurring monthly fee, Student Loan Processing.US, under the direction and control of Krause, purported to perform a variety of student loan debt relief services for its customers. Those

services included helping borrowers identify the various U.S. Department of Education repayment plans for which the borrowers qualify, helping borrowers prepare and complete their application for a Direct Consolidation Loan, assisting borrowers to "correct" any errors made by the U.S. Department of Education in processing the borrower's enrollment in a repayment plan, and complying with annual recertification programs and/or helping borrowers identify more favorable repayment programs in the event that the borrower's circumstances have changed, thereby making the borrower eligible for other repayment programs.

13. The enrollment fee charged by Defendants for their services amounted to the greater of 1% of the borrower's federal student loan balance or $250.

14. Defendants also charged consumers a recurring monthly fee. The "Monthly Maintenance Fee" was generally $39 per month and was charged for the entire repayment term of the borrower's federal student loan. The $39 fee, however, was predicated on the borrower paying said fee via automatic debit. If the consumer refused to provide their financial institution account information for automatic debits, Defendants charged the customer an additional $15 per month, making the recurring monthly fee $54 per month.

**The Marketing and Advertising of Defendants' Debt Relief Services**

15. Defendants operated at least three active URLs to advertise their student loan debt relief services, all of which contain either an ".us" or ".org" suffix: www.studentloanprocessing.us, www.slpus.org, and www.studentloanprocessing.org. Defendants also operated several social media websites including pages and accounts on Facebook, LinkedIn, Tumblr, and Twitter.

16. Throughout the relevant time period, Defendants primarily relied on a direct mailer and outbound telemarketing to attract consumers. Some consumers learned about Student Loan Processing.US through website submissions or

customer referrals, although it is estimated that less than 10% of customers learned about Defendants through those two channels.

17. Aside from a few non-material changes, the outside of the bi-fold direct mailer used by the Defendants during the relevant period generally appeared as displayed below, and included the words "Official Business" in bold font, a citation to 18 U.S.C. §§ 1702 *et seq.*, a bald-eagle stamp, and the logo of Student Loan Processing.US (which changed during the relevant time period, as discussed infra).




18. Inside the Defendants' mailer, displayed in Paragraph 17 above, language stated that Student Loan Processing.US "work[s] with the Department of Education to consolidate all your existing Federally Insured Student Loans." The mailer also purported to highlight "new" federal student loan benefits, which include lower monthly payments, lower interest rates, forgiveness programs, and increased monthly cash flow. Touting the "easy qualification process," the direct mailer used by Defendants during the relevant time period directed the borrower to

call Defendants' toll-free number before their next payment due date to "receive [their] federal benefits."

**Defendants' Enrollment Process and Advance Fee Collection**

19. Consumers who contacted Defendants in response to an outbound call, the Defendants' mailer, or any other recruitment channel spoke with a self-proclaimed "Student Loan Specialist" for enrollment with Student Loan Processing.US.

20. The enrollment calls typically began with staff at Student Loan Processing.US telling the consumer that they were "prequalified" for certain federal student loan repayment and forgiveness programs. During the call, the "specialists" directed the consumer to divulge their confidential 4-digit PIN information for the U.S. Department of Education's National Student Loan Data System, collected information about the borrower's federal student loan balances and annual income, and then quoted the new expected federal student loan monthly payment amount for borrowers who enroll.

21. Defendants then gathered banking information from the borrower for payment of the enrollment fee, which was generally collected from the consumer's debit/credit card or bank account during the initial enrollment call. If a consumer needed to schedule payment of the enrollment fee or to break the enrollment fee into more than one payment, Defendants' employees were directed to ask the consumer about the frequency with which they were paid, as well as their next expected payday, in order to schedule the enrollment fee payment around that date.

22. During the relevant time period, Defendants requested and received millions of dollars in enrollment fees from consumers seeking student loan debt relief services.

23. Full payment of the enrollment fee was required before Defendants mailed the application for the Direct Consolidation Loan to the consumer, and as a

result, well before the U.S. Department of Education modified or altered any of the repayment terms of the consumer's federal student loans.

24. All the terms of the contractual relationship between Defendants and the consumers, including payment terms, were set forth in a written agreement between the two parties, which was generally transmitted to the consumer via email towards the end of the enrollment call. Consumers were required to execute the agreement with the Defendants to complete enrollment with Student Loan Processing.US. The agreement remains in effect until the consumer's federal student loans are "paid in full" or "discharged due to [the consumer] qualifying for a federal discharge."

25. Enrollment for any and all of the services offered by Student Loan Processing.US was done over the phone, and there was no option for face-to-face enrollment.

**Defendants' Misrepresentations about an Affiliation with the U.S. Department of Education**

26. Throughout the relevant time period, Defendants misrepresented to consumers, directly or by implication, that they were agents of the U.S. Department of Education or were affiliated with that agency in some capacity.

27. In truth and in fact, Defendants are not currently, nor have they ever been, affiliated with, endorsed by, or sponsored by the U.S. Department of Education.

28. As described above in Paragraphs 17 and 18, throughout the relevant time period, Defendants used a bi-fold direct mailer to solicit customers, which included the words "Official Business" in bold font, a citation to 18 U.S.C. §§ 1702 *et seq.*, a bald-eagle stamp, and the logo of Student Loan Processing.US on the mailer's exterior. Inside the mailer, language stated that Student Loan Processing.US "work[s] with the Department of Education to consolidate all your

existing Federally Insured Student Loans" without any disclaimer that Defendants had no affiliation with the U.S. Department of Education.

29. Until at least late August 2012, Defendants' website, accessible at www.studentloanprocessing.us, stated that Student Loan Processing.US "work[ed] together with the Department of Education!" with no disclaimer that Defendants were not, nor ever were, affiliated with the U.S. Department of Education.

30. On August 27, 2012, the U.S. Department of Education sent Defendants a letter concerning Defendants' use of a misleading seal and certain misrepresentations on Defendants' website. In that letter, the U.S. Department of Education requested that Defendants make changes to their website and insisted that a disclaimer be placed on the homepage.

31. From approximately September 2012 until sometime in 2014, Defendants included disclaimer language in small font at the bottom of their website homepage stating that Student Loan Processing.US was not affiliated with the U.S. Department of Education. The language, however, was not conspicuous. In 2014, the disclaimer language was moved to the "Frequently Asked Questions" section of the website.

32. Until approximately September 2012, the logo for Student Loan Processing.US (image on the left below) shared several similarities with the U.S. Department of Education seal (image on the right below), including the outer spherical gold border, inner spherical gold border, tree "growing" from a base, and medium blue shading between the borders with white text.

33. The logo for Student Loan Processing.US was used on all printed materials distributed to consumers by the Defendants, including the direct mailer described in Paragraph 17 above, as well as on the website and all social media sites for Student Loan Procesing.US.

34. In or around September 2012, Defendants modified the logo to appear as displayed below. While the tree has been removed and replaced by a gold shield and two American flags, the new seal still shares similarities with the U.S. Department of Education seal, including the medium blue shading between the borders with the white text, as well as the inner and outer spherical gold border, and continues to resemble a government seal.

35. As noted above in Paragraph 20, during the enrollment call, Defendants required consumers to provide their confidential 4-digit PIN for the U.S. Department of Education's National Student Loan Data System ("NSLDS"). In requesting this information, employees stated that they "already [had] access to the DOE's National Student Loan Database" but noted that they needed to "verify [the consumer's] information and answer to the challenge question." Employees then used the borrower's 4-digit PIN to log into NSLDS as if they were the borrower. If consumers could not recall their 4-digit PIN, the employees requested a duplicate PIN on the borrower's behalf.

36. In truth and in fact, the NSLDS "access" that Defendants represented to "already have" was no more than public access to the NSLDS Student Access

website, which anyone, including the borrower, could have accessed at www.nslds.ed.gov.

**Defendants' Misrepresentations Related to the Cost of Their Student Debt Relief Services**

37. Throughout the relevant time period, Defendants also misled consumers about the price of their services, including the fact that the quoted price included a recurring monthly maintenance fee charged by Defendants.

38. During the enrollment call, Defendants directed their student loan "specialists" to include the recurring monthly fee in the new monthly payment amount that the consumer would be expected to pay if she enrolled with Student Loan Processing.US and were put in a U.S. Department of Education repayment program. In discussing the consumer's eligibility for a U.S. Department of Education repayment program, Defendants would advise borrowers that the repayment program that could save them the most money over the life of a loan was a program where "the monthly payment" was only "$___ per month for ___ months." The quoted figure included the $39 monthly payment amount.

39. Later in the enrollment call, Defendants separately disclosed the enrollment fee and the recurring monthly fee, but downplayed those fees by stating that "all of the saving and the payments we discussed already have all of the fees for our services included and there are no additional costs whatsoever." Defendants also explained that the recurring monthly fee was required because Defendants have to "re-certify [the consumer's] eligibility for the [repayment] program every twelve months," even though such recertification is not required for every repayment program.

40. Defendants failed, during the enrollment call, to clearly and expressly explain that the recurring monthly maintenance fee would be charged for the

repayment term of the borrower's federal student loans, and made no statements about the duration of the recurring fee.

41. For at least some consumers whose financial circumstances could potentially qualify them for a $0 monthly payment, Defendants regularly advised those consumers that Student Loan Processing.US could get that consumer's monthly payment amount "down to $39," without separately explaining that the entire $39 payment would be paid to Defendants as a monthly fee, rather than payment toward the consumer's federal student loans. These types of statements, as well as those described in the preceding paragraphs, were made before a consumer consented to payment, as well as during the actual enrollment (when payment was made).

## COUNT I

### (Abusive Telemarketing Act or Practice Related to Advance Fees)

42. The allegations in Paragraphs 1 to 41 are incorporated here by reference.

43. It is an abusive telemarketing act or practice and a violation of the TSR for any seller or telemarketer to request or receive payment of any fee or consideration for any debt relief service until and unless:

a. The seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer;

b. The customer has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor or debt collector; and

c. To the extent that debts enrolled in a service are renegotiated, settled, reduced, or otherwise altered individually, the fee or consideration either (1) bears the same proportional relationship to the total fee for renegotiating, settling, reducing, or altering the terms of the entire debt balance as the individual debt amount bears to the entire debt amount; or (2) is a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration. 16 C.F.R. § 310.4(a)(5)(i).

44. Defendants are a "sellers" or "telemarketers" engaged in the "telemarketing" of "debt relief services" as defined by the TSR. 16 C.F.R. §§ 310.2(m), (aa), (cc), and (dd).

45. In numerous instances during the relevant time period, in connection with telemarketing student loan debt relief services, Defendants have requested and received payment of a fee or consideration for a debt relief service before (1) it has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or otherwise such valid contractual agreement executed by the customer; and (2) the customer made at least one payment pursuant to that agreement.

46. Therefore, Defendants have engaged in abusive telemarketing acts or practices in violation of the TSR. 16 C.F.R. § 310.4(a)(5)(i).

## <u>COUNT II</u>

**(Deceptive Telemarketing Act or Practice Related to Government Affiliation)**

47. The allegations in Paragraphs 1 to 41 are incorporated here by reference.

48. It is a deceptive telemarketing act or practice and a violation of the TSR for any seller or telemarketer to misrepresent, directly or by implication, in the sale of good or services, a seller's or telemarketer's affiliation with, or

endorsement or sponsorship by, any person or government entity. 16 C.F.R. § 310.3(a)(2)(vii).

49. As described above, in numerous instances during the relevant time period, in the course of telemarketing student loan debt relief services, Defendants made misrepresentations, directly or by implication, that created the net impression that Defendants were affiliated with, endorsed by, or sponsored by the U.S. Department of Education, a federal government entity.

50. Therefore, Defendants have engaged in deceptive telemarketing acts or practices in violation of the TSR. 16 C.F.R. § 310.3(a)(2)(vii).

**COUNT III**

**(Deceptive Telemarketing Act or Practice Related to Cost)**

51. The allegations in Paragraphs 1 to 41 are incorporated here by reference.

52. It is a deceptive telemarketing act or practice and a violation of the TSR for any seller or telemarketer, before a customer consents to pay for goods or services offered, to fail to disclose truthfully, in a clear and conspicuous manner, the total costs to purchase, receive, or use, and the quantity of, any good or services that are the subject of the sales offer. 16 C.F.R. § 310.3(a)(1)(i).

53. It is a deceptive telemarketing act or practice and a violation of the TSR for any seller or telemarketer, to misrepresent, directly or by implication, in the sale of good or services the total costs to purchase, receive, or use, and the quantity of, any goods or services that are the subject of a sales offer. 16 C.F.R. §§ 310.3(a)(2)(i).

54. As described above, in numerous instances during the relevant time period, in the course of telemarketing student loan debt relief services and before the consumer consented to pay, Defendants failed to disclose truthfully, in a clear

and conspicuous manner, the total costs to purchase, receive, or use the Defendants' goods or services.

55. As described above, in numerous instances during the relevant time period, in the course of telemarketing student loan debt relief services, Defendants misrepresented, directly or by implication, the total costs to purchase, receive, or use Defendants' good or services.

56. Therefore, Defendants have engaged in deceptive telemarketing acts or practices in violation of the TSR. 16 C.F.R. §§ 310.3(a)(1)(i) and 310.3(a)(2)(i).

## COUNT IV

### (Deceptive Acts or Practices Related to Government Affiliation)

57. The allegations in Paragraphs 1 to 41 are incorporated here by reference.

58. The CFPA prohibits any covered person from engaging in deceptive acts or practices. 12 U.S.C. § 5536(a)(1)(B).

59. As described above, in numerous instances during the relevant time period, in connection with the offering or provision of student loan debt relief services, Defendants made representations, expressly or by implication, that created the net impression that Defendants were affiliated with the U.S. Department of Education.

60. In truth and in fact, Defendants are not, and never have been, affiliated with U.S. Department of Education or any other state or federal government agency. This misrepresentation of government affiliation is material and likely to mislead a reasonable consumer.

61. Therefore, Defendants' misrepresentations as set forth herein constitute deceptive acts and practices in violation of sections 1031 and 1036(a)(1) of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1).

**COUNT V**

**(Deceptive Acts or Practices Related to Cost)**

62. The allegations in Paragraphs 1 to 41 are incorporated here by reference.

63. The CFPA prohibits any covered person from engaging in deceptive acts or practices. 12 U.S.C. § 5536(a)(1)(B).

64. As described above, in numerous instances during the relevant time period, in connection with the offering or provision of student loan debt relief services, Defendants failed to clearly disclose and misrepresented the total cost of Defendants' student loan debt relief services. This misrepresentation related to the cost of Defendants' services is material and likely to mislead a reasonable consumer.

65. Therefore, Defendants' misrepresentations as set forth herein constitute deceptive acts and practices in violation of sections 1031 and 1036(a)(1) of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1).

**THE COURT'S POWER TO GRANT RELIEF**

66. The CFPA empowers this Court to grant any appropriate legal or equitable relief with respect to violations of Federal consumer financial law, including, without limitation, permanent or temporary injunction, rescission or reformation of contracts, the refund of moneys paid, restitution, disgorgement or compensation for unjust enrichment, and civil money penalties. 12 U.S.C. §§ 5565.

**PRAYER FOR RELIEF**

WHEREFORE, the Bureau requests that the Court:

a. Permanently enjoin Defendants from committing future violations of the TSR and the CFPA;

b. Order Defendants to pay restitution to consumers harmed by their unlawful conduct;

c. Order disgorgement of ill-gotten revenues against Defendants;

d. Impose civil money penalties against Defendants;

e. Order the rescission or reformation of contracts where necessary to redress injury to consumers;

f. Order Defendants to pay the Bureau's costs incurred in connection with proceeding with this action; and

g. Award additional relief as the Court may determine to be just and proper.

Dated: December 11, 2014

Respectfully submitted,

Anthony Alexis
*Acting Enforcement Director*
Ori Lev
*Deputy Enforcement Director*
Frank Kulbaski
*Assistant Deputy Enforcement Director*
Rina Tucker Harris
*Enforcement Attorney*

/s/ Brandis Anderson
Brandis C. Anderson, CA Bar # 261325
(Email: Brandis.Anderson@cfpb.gov)
*Enforcement Attorney*
1700 G Street NW
Washington, DC 20552
Phone: (202) 435-7548
Fax: (202) 435-7722

Attorneys for Plaintiff
Consumer Financial Protection Bureau