DAVID RUBENSTEIN, DC Bar #458770
*Deputy Enforcement Director*
FRANK KULBASKI, DC Bar #438917
*Assistant Deputy Enforcement Director*
RINA TUCKER HARRIS, DC Bar #444550 (*Pro Hac Vice*)
(Email: RinaTucker.Harris@cfpb.gov; Phone: 202-435-9196)
NICHOLAS JABBOUR, DC Bar #500626 (*Pro Hac Vice*)
(Email: Nicholas.Jabbour@cfpb.gov; Phone: 202-435-7508)
BRANDIS C. ANDERSON, CA Bar #261325
(Email: Brandis.Anderson@cfpb.gov; Phone: 202-435-7548)
*Enforcement Attorneys*
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
Fax: 202-435-7722

KENT KAWAKAMI, CA Bar #149803 – Local Counsel
(Email: Kent.Kawakami@usdoj.gov; Phone: 213-894-4858)
United States Attorney's Office
Central District of California – Civil Division
300 North Los Angeles Street, Room 7516
Los Angeles, CA 90012
Fax: 213-894-2380

Attorneys for Plaintiff Consumer Financial Protection Bureau

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION**

| | |
|---|---|
| Consumer Financial Protection Bureau,<br><br>Plaintiff,<br><br>v.<br><br>IrvineWebWorks, Inc. d/b/a Student Loan Processing.US; *et al.*,<br><br>Defendants. | Case No. SACV14-1967-JVS (DFMx)<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT I OF THE COMPLAINT**<br><br>**HON. JAMES V. SELNA**<br><br>**Date: January 25, 2016**<br>**Time: 1:30 PM**<br>**Place: Courtroom 10C (Santa Ana)** |

# TABLE OF CONTENTS

INTRODUCTION ........ 1

RESPONSE TO "UNDISPUTED FACTS" ........ 3

ARGUMENT ........ 3

I. The TSR Covers Services That Consist Of A Group of Procedures To Renegotiate, Settle, Or Alter The Terms Of The Consumer's Debt, Which Might Include Loan Consolidation ........ 4

II. Defendants Fall Within The TSR's Definition Of "Debt Relief Service" ........ 8

A. Defendants Represent That They Provide A Service To Renegotiate, Settle, Or Alter The Terms Of Student Loan Debt, And That Is The Service That Consumers Seek ........ 8

B. For Some Consumers, The Defendants Do Not Perform Any Consolidation Services, Further Demonstrating That Defendants Are A "Debt Relief Service" ........ 10

C. Defendants Exhibit The Same Characteristics Of The Debt Relief Companies That Prompted The FTC To Promulgate The 2010 TSR Amendments ........ 12

CONCLUSION ........ 14

# TABLE OF AUTHORITIES

## Regulatory Materials

16 C.F.R. § 310.2 (2010) ..........1, 2, 5

75 Fed. Reg. 48458 (2010) ..........*passim*

## Other Authorities

FTC, "Debt Relief Services & the Telemarketing Sales Rule: What People Are Asking," *available at* https://www.ftc.gov/tips-advice/business-center/guidance/debt-relief-services-telemarketing-sales-rule-what-people-are (last accessed Jan. 4, 2016).......... 6-7

Plaintiff Consumer Financial Protection Bureau ("Bureau") respectfully submits this opposition to the Motion for Partial Summary Judgment on Count I of the Complaint filed by Defendants IrvineWebWorks, Inc. d/b/a Student Loan Processing.US ("Student Loan Processing.US" or "Company") and James Krause.[1]

**INTRODUCTION**

In their Motion, Defendants do not dispute that they are "sellers" or "telemarketers" engaged in "telemarketing," as those terms are defined in the Telemarketing Sales Rule ("TSR"). 16 C.F.R. § 310.2(aa), (cc), (dd) (2010); *see also* Def. Mem. at 10. In addition, Defendants do not dispute that they charge a fee before performing any services for their clients. *See* Def. Mem. at 11 ("There is no dispute that SLP charges a fee prior to the client's execution of a new loan and first payment on that loan."); Def. Mem. at 8 (indicating that prospective clients must make "immediate payment of SLP's enrollment fee" before Student Loan Processing.US has done any work). Accordingly, there is no dispute that, if Defendants' activities fall within the definition of a "debt relief service," as that phrase is used in the TSR, then the Bureau is entitled to judgment in its favor on Count I of the complaint. *See* Def. Mem. at 5 (indicating that Count I is "entirely reliant on th[e] question" of whether Defendants' activities constitute a "debt relief service"). As the Bureau demonstrated in its Motion for Summary Judgment, and as further detailed in this opposition brief, Defendants' activities are indeed a "debt relief service."

[1] Throughout this opposition, the Bureau refers to the memorandum of points and authorities ("Def. Mem.") and a declaration from James Krause ("Def. Mem., Krause Decl.") that accompanied Defendants' motion.

On the same day that Defendants filed their motion, the Bureau moved for summary judgment on all counts of the complaint. Throughout this opposition, the Bureau refers to its memorandum of points and authorities accompanying its motion ("Pl. Mem."), paragraphs in the Bureau's Statement of Uncontroverted Facts ("Pl. UF ¶"), and exhibits attached to the Bureau's Statement of Uncontroverted Facts ("Pl. SJ Ex.").

Defendants admit, as they must, that their direct mailer – the primary means by which they solicited consumers – promised consumers lower payments, lower interest rates, and possible loan forgiveness. *See* Def. Mem. at 7. And Defendants attach to their motion the scripts used by Company representatives, which open by focusing on the Company's purported ability to obtain loan forgiveness and lower loan payments for its customers. *See* Def. Mem., Krause Decl. at 19-20. On their face, these statements fall squarely within the definition of "debt relief service" contained in the TSR – a "program or service *represented* . . . to renegotiate, settle, or in any way alter the terms of payment . . . between a person and one or more unsecured creditors." 16 C.F.R. § 310.2(m) (2010) (emphasis added). In light of Defendants' representations as to their services, it is not surprising that, when consumers enroll with the Company, their goals are lower payments and a faster repayment schedule – or, put differently, debt relief.

Defendants attempt to argue that they fall within a carve-out to the definition of "debt relief service," articulated in a footnote in the Federal Register, because they contend that they offer to "refinance existing loans with a new loan." Def. Mem. at 10-14. As demonstrated below, this argument is incorrect. The footnote indicates, in language not quoted by the Defendants, that "regardless of its form, anything sold to consumers that consists of a specific group of procedures to renegotiate, settle, or in any way alter the terms of a consumer debt, is covered by the definition" of "debt relief service." 75 Fed. Reg. 48,458, 48,466 n.123 (2010). And the FTC has advised that entities cannot evade the TSR by bundling debt relief services with other services. *Id.* at 48,467. Because Defendants purport to provide debt relief services, they are covered by the TSR, even though some, but not all, of their customers consolidate their loans in order to enroll in certain repayment plans offered by the U.S. Department of Education ("ED").

In sum, a plain reading of the definition of "debt relief service" establishes that Defendants' services fall within its scope. As a result, the Court should deny the

Defendants' Motion for Partial Summary Judgment on Count I of the Complaint.

## **RESPONSE TO "UNDISPUTED FACTS"**

Defendants' brief contains a section titled "Undisputed Facts," which contains many purported "facts" not found in its Separate Statement of Uncontroverted Facts. Because Local Rule 56-1 indicates that material facts as to which there is no genuine dispute must be in the separate statement, the Bureau interprets any "Undisputed Facts" not in the Separate Statement to be non-material facts.

Many of these non-material "facts," however, are merely unfounded assertions that are not based in actual facts or analysis. For example, Defendants contend in their brief that compensation for government-contracted servicers is designed to incentivize "mistakes" by servicers (*see* Def. Mem. at 7 n.2), but Defendants do not cite to any actual facts to support this allegation. Likewise, Defendants' claim that applying for ED repayment plans is "difficult and time consuming" (*see* Def. Mem. at 6) is also unsupported by any facts. These are just two examples of unsupported "facts" made by Defendants throughout their brief. Although there are others, the Court need not address the accuracy of these statements to find that Defendants are offering "debt relief services" covered by the TSR.

## **ARGUMENT**

Defendants argue that they do not meet the definition of a "debt relief service" under the TSR because they fall within a carve-out for "refinance" services. To better understand the scope of the "refinance" exemption, it is first necessary to understand the purpose of the 2010 amendments to the TSR and why those amendments are not intended to cover "refinance" services. This analysis demonstrates that Defendants – who represent their services to be the alteration of consumers' repayment terms and settlement of their debts through loan forgiveness – fall squarely within the definition of a "debt relief service" and are not covered by the "refinance" exemption, even if consolidation services were performed in conjunction with the debt relief services for some consumers. Indeed, the Defendants'

questionable practices are remarkably similar to those described by the FTC when it promulgated the 2010 amendments addressing debt relief service sellers and telemarketers.

## I. <u>The TSR Covers Services That Consist Of A Group of Procedures To Renegotiate, Settle, Or Alter The Terms Of The Consumer's Debt, Which Might Include Loan Consolidation</u>

The 2010 amendments to the TSR were meant to address abuses by entities involved in the offering of debt relief services. As the FTC made clear in the Federal Register entry accompanying the amendments, any company representing that it provides "debt relief services" falls within the scope of the TSR, regardless of how those services are structured. 75 Fed. Reg. at 48,466-67. Only pure refinancing transactions – something that the Defendants undisputedly have not marketed or provided – are outside of the scope of the TSR's rules regarding debt relief services.

The Federal Register entry details various practices related to offers of debt relief services that had come to the attention of the FTC. These debt relief offers generally promised the consumer better payment terms – lower payments, principal forgiveness, interest rate reductions, or other concessions – that would allow the consumer to pay down his/her unsecured debt on more favorable terms over time. 75 Fed. Reg. at 48,459-64. However, the consumer was typically required to pay a substantial advance fee before the company actually undertook any work on the consumer's behalf, as well as ongoing monthly fees while the service provider purported to assist the consumer in paying down the debt. *Id.* These fees frequently were misrepresented or undisclosed, such that the consumer might not realize that the fees were not helping to pay his/her debt, and the fees could present a significant financial imposition on the consumer such that he/she would be less able to make payments toward his/her debt. *Id.* at 48,484-85. The FTC noted that offers for debt relief services "frequently take place in the context of high pressure sales tactics, contracts of adhesion, and deception," in which the provider "exhort[s] consumers to

fill out the enrollment documents and return the papers as quickly as possible" and where the provider often makes deceptive "debt reduction guarantees or government affiliation claims." *Id.* at 48,485. In this context, financially vulnerable consumers were often misled about the results that could be achieved and were left financially worse off than they otherwise would have been had they not enrolled with a debt relief company. *Id.* at 48,487.

Against this backdrop of severe abuses in the debt relief industry, the FTC made clear that its definition of "debt relief service" was intended to be broad, covering "all current and reasonably foreseeable forms of debt relief services." *Id.* at 48,467. Though the FTC gave some examples of debt relief entities, such as companies offering debt management plans and debt settlement, the FTC indicated that its goal was "ensuring that consumers are protected regardless of how a debt relief service is structured or denominated." *Id.* Thus, the full definition of "debt relief service" is expansive, reading as follows:

> any service or program represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors or debt collectors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector.

16 C.F.R. § 310.2(m); *see also* 75 Fed. Reg. at 48,466. In a footnote in the Federal Register, the FTC offered the following clarification:

> [R]egardless of its form, anything sold to consumers that consists of a specific group of procedures to renegotiate, settle, or in any way alter the terms of a consumer debt, is covered by the definition. The definition is not intended, however, to cover services or products that offer to refinance existing loans with a new loan as a way of eliminating the original debts, as such a process would result in a new extension of credit that replaces the existing debts rather than altering them.

75 Fed. Reg. at 48,466 n.123.

While the Federal Register entry does not offer any further elaboration on the "refinance" exemption, the exemption is easily understood when reading it in the context of the entire Federal Register entry. In promulgating the 2010 amendments, the FTC indicated concern about situations in which debt relief providers made promises to distressed and vulnerable consumers regarding the provider's ability to negotiate, settle, or alter the payment terms of a consumer's debt in order to make that debt more manageable to repay. *Id.* at 48,487. The consumer often had to pay substantial advance and ongoing fees for these services, yet it was not always clear that the debt relief provider followed through on its promises. *Id.* at 48,459-64.

In contrast, where only a refinancing occurs, these concerns are not present. The relationship between the consumer and the refinancing entity is not ongoing; the refinance replaces the existing debts, rather than altering how the consumer repays his/her existing debts over time. Thus, where product or service being offered is a new extension of credit, and nothing more, it makes sense that it is not a "debt relief service" within the meaning set forth in the TSR. It also makes sense that, if an entity were to offer a service in which it would renegotiate, settle, or alter the new extension of credit, that entity would be a "debt relief service"; the fact that the renegotiation, settlement, or alteration of payment terms is occurring with respect to a newly refinanced loan, rather than a prior loan, would be immaterial.

The analysis is no different when the same company offers both the new extension of credit to the consumer, as well as a renegotiation, settlement, or alteration of the payment terms of that new extension of credit: that is a debt relief service. The FTC itself has noted that companies cannot evade the TSR by bundling debt relief services with other services: "[Y]ou can't evade the Rule just by providing a product to your customers in connection with your debt relief service."[2] In other

[2] FTC, "Debt Relief Services & the Telemarketing Sales Rule: What People Are Asking," *available at* https://www.ftc.gov/tips-advice/business-

words, where, as here, a company "promote[s] or provide[s]" debt relief services, that company is covered by the TSR, even if it also offers other products or services in connection with the debt relief services.[3]

Student Loan Processing.US does not purport to simply offer consolidation; rather, it purports to offer an ongoing relationship with consumers in which it will manage repayment of the consumers' student loans by helping them take advantage of various repayment and forgiveness programs over a period of time. Pl. UF ¶¶ 23, 27, 28. Indeed, the FTC's footnote confirms that "regardless of its form, anything sold to consumers that consists of a specific group of procedures to renegotiate, settle, or in any way alter the terms of a consumer debt, is covered by the definition." 75 Fed. Reg. at 48,466 n.123. Thus, a group of procedures that includes consolidation as well as renegotiation, settlement, or alteration of debt – as is the case here – is covered by the TSR.

Although Defendants rely heavily on an assertion that the terms of the consolidation loan terms are not negotiable with ED (Def. Mem. at 12), Defendants marketed their services to be far more extensive than consolidation. It is the responsibility of the borrower to select which of their Federal education loans they would like to consolidate, choose a particular repayment plan, and ensure that they take any action necessary to qualify for possible loan forgiveness. Defendants marketed their services as providing advice with respect to these debt relief benefits and helping consumers maintain these benefits. Pl. UF ¶¶ 23, 27, 28. As Mr. Krause himself states in his declaration, the Company's services after loan consolidation

---

center/guidance/debt-relief-services-telemarketing-sales-rule-what-people-are (last accessed Jan. 4, 2016); *see also* 75 Fed. Reg. at 48,467 ("Nor can a provider evade the rule by including a 'product,' such as educational material on how to manage debt, as part of the service it offers.").

[3] FTC, "Debt Relief Services & the Telemarketing Sales Rule: What People Are Asking," *supra* note 2.

purportedly include "ensuring proper repayment program assignment," maintaining "regular communication with its clients about changes in their circumstances that could impact their repayment plan," and ensuring that annual recertification forms for repayment plans are completed. Def. Mem., Krause Decl. ¶¶ 8, 10, 20. Thus, it is evident that the Company purported to offer not merely consolidation, but a long-term relationship with the customer focused on the provision of debt relief services.

## II. Defendants Fall Within The TSR's Definition Of "Debt Relief Service"

With the above context in mind, it is clear that Defendants fall within the definition of a "debt relief service," and indeed that Defendants are exactly the type of entity that the FTC was intending to regulate.

### A. Defendants Represent That They Provide A Service To Renegotiate, Settle, Or Alter The Terms Of Student Loan Debt, And That Is The Service That Consumers Seek

Defendants claim that their advertising materials merely describe "loan consolidation" and not debt relief. *See* Def. Mem. at 12. However, a simple examination of the Defendants' principal marketing materials –the direct mailer and the Company's call scripts – belies this claim:

- The direct mailer, which was the principal method the Company used to solicit customers, advertises – in a prominent box in the center of the page – the following benefits: "**LOWER MONTHLY PAYMENT**," "**LOWER INTEREST RATES**," "**FORGIVENESS PROGRAMS**," AND "**INCREASE YOUR MONTHLY CASH FLOW**." Def. Mem., Krause Decl. at 8. The word "consolidate" appears only once, in lowercase letters, near the bottom of the page, and its meaning is not explained in any way. *Id.*
- The scripts used by the Company similarly focus on debt relief. When a consumer calls, the first substantive remark by the call "coordinator" is the following: "Well [name of customer] I would like to take this opportunity to discuss the New Federal Forgiveness Programs offered by the Department of

Education. Have you heard about these new programs that can forgive large portions and in some cases all of your Federal student loans?" *Id.* at 19. The coordinator then purports to "prequalify" the consumer for "these programs [that] can save you on your Federal Student Loans." *Id.* Nothing in the coordinator's script mentions consolidation or obtaining a new loan. Instead, the coordinator's script mentions the possibility of "settling" the consumer's debt through "New Federal Forgiveness Programs." *Id.*

- When the coordinator transfers the call to a "specialist," the first substantive questions from the specialist are whether the consumer is current on his/her loan payments, what the payment amount is, and "is that a comfortable payment for you or is it causing any kind of a strain on the family budget?" *Id.* at 20. In response to that last question, the script directs the specialist to "Let them talk. Listen for what they need[:] a lower payment or pay the loan faster with less interest." *Id.* As the script continues, the specialist eventually quotes a lower monthly payment amount that the Company can purportedly help the borrower obtain. *Id.* at 22.
- The Company's other advertisements, as well as its Service Agreement, are heavily focused on promises of debt relief, lower payments, and loan forgiveness. Pl. Mem. at 11; Pl. UF ¶¶ 27, 64, 72-75, 77-81, 84-85.

Simply put, Defendants' claims that they do not promote settlement or alteration of consumers' debts and merely promote consolidation are pure fantasy.

Lest there be any doubt, Company representatives confirmed that the *only* reasons that consumers cite for calling the Company are debt relief. For example, the Company's Rule 30(b)(6) representative, Mr. Krause, testified that consumers who contacted the Company had only two goals in doing so:

Q: [What are the] [g]oals that clients have?

A: . . . Either lower payments or pay it [their loans] off as soon as possible would be about the only two that would be their goals.

Pl. SJ Ex. 37 (SLP 30(b)(6) Dep.) at 517; *see also* Pl. UF ¶ 94. Similarly, Stephen Saavedra, a former manager and sales representative, testified that the only reasons that consumers enrolled with the Company were to alter the terms of payment on their student loans:

> Q: . . . I believe before you said that consumers expressed that they wanted to lower their monthly payment or maybe pay on a shorter time frame, is that correct?
>
> A: Yes.
>
> Q: Was there any other reason where specifically, again, talking about the time in which you were the sales agent that consumers expressed to you why they wanted to enroll with Student Loan Processing?
>
> A: Other than that – those two reasons, to help their financial situation or to save money, no.

Pl. SJ Ex. 38 (Saavedra Dep.) at 551. Thus, not only did the Company represent that its services consisted of debt relief, but consumers confirmed that their purpose in contacting the Company was to obtain debt relief.

### B. For Some Consumers, The Defendants Do Not Perform Any Consolidation Services, Further Demonstrating That Defendants Are A "Debt Relief Service"

Defendants' claim that they are merely a debt consolidation service is further undercut by the fact that they charge the same fees to consumers for whom they do not perform consolidation as they do to consumers for whom they do perform consolidation. When some consumers contacted the Company, those consumers had already consolidated their student loans on their own and thus the Company did not perform any consolidation services. Pl. UF ¶ 114. In those cases, the Company charged the same fees as it does to consumers for which it does perform consolidation. *Id.* According to Company representatives, all consumers are charged the same fees because consumers are not paying for specific items from the

Company, but rather for the entire group of debt relief procedures that the Company advertises, regardless of whether all of the procedures are used for his/her situation. As Thomas Gill, a manager with the Company, testified:

> Q: Now, for a consumer who already had their loans consolidated prior to their enrollment with you, do you still collect the enrollment fee?
>
> A: The enrollment fee is just that, an enrollment cost. It's not a consolidation fee.
>
> Q: So is your answer yes?
>
> A: My answer would be yes.

Pl. SJ Ex. 35 (Gill Dep.) at 464. The Company representative, Mr. Krause, similarly testified that the Company charges its fees in order to get consumers into a "better [repayment] plan," not for consolidation:

> Q: Do you offer services to consumers who have already consolidated their loan into the direct consolidation loan?
>
> A: Yes
>
> . . . .
>
> Q: Has -- do the services offered to . . . consumers who already had their loans consolidated into the direct consolidation loan program differ from services you provide to your other customers?
>
> A: No. Because the service is getting them into a better [repayment] plan than they are already in.
>
> Q: [For the] consumers who already had their loan as a direct consolidation loan, does the company assess that -- did the company assess those consumers an enrollment fee?
>
> A: Yes.

Pl. SJ Ex. 37 (SLP 30(b)(6) Dep.) at 494.

The undisputed facts contradict the Defendants' claim that the Company purely performs consolidation services. Defendants advertised that they will lower

consumers' debts and improve repayment terms, and the Company's 30(b)(6) representative even testified that "the service is getting [consumers] into a better [repayment] plan." The fact that the Defendants used consolidation of the debts as part of the "group of procedures" to accomplish the goal of getting consumers into a better repayment plan, does not change that the Defendants were selling a debt relief service.

### C. <u>Defendants Exhibit The Same Characteristics Of The Debt Relief Companies That Prompted The FTC To Promulgate The 2010 TSR Amendments</u>

While the Defendants studiously attempt to differentiate themselves from the debt relief providers that prompted the FTC to promulgate the 2010 amendments to the TSR (Def. Mem. at 13), the truth is that the Defendants use the same questionable tactics, charge the same problematic fees, and give consumers the same false hope that the FTC detailed in the Federal Register.

Defendants' sales methods virtually mimic those that the FTC described. Defendants' representatives use "high pressure sales tactics," in which consumers are "exhort[ed] . . . to fill out the enrollment documents and return the papers as quickly as possible." 75 Fed. Reg. at 48,485; *see, e.g.*, Pl. SJ Ex. 47 (Latus Decl.) at 1374 ("I did not feel that I had enough time to fully review the agreement"); Pl. SJ Ex. 51 (Chang Decl.) at 1395 ("[The Company representative] indicated that [the service agreement] had to be signed that day"). The script instructs representatives to send the Service Agreement only if the consumer is at his/her computer, and to attempt to procure the consumer's signature electronically before the call ends. Def. Mem., Krause Decl. at 23. Defendants require that consumers "assign . . . power of attorney" to Student Loan Processing.US and, for many consumers, Defendants "executed a change of address form substituting [the Company's] address for the consumer's, thereby redirecting billing statements . . . so that the consumer does not receive them." 75 Fed. Reg. at 48,462; *see, e.g.*, Pl. SJ Ex. 46 (Kletzka Decl.) at

1370 ("the Company changed my contact information with ED without my authorization"); Pl SJ. Ex. 47 (Latus Decl.) at 1375-76 (Company changed address to its own). Defendants make "government affiliation claims" to lend legitimacy to their services. 75 Fed. Reg. at 48,485; *see, e.g.*, Pl. UF ¶¶ 120-52; Pl. SJ Ex. 50 (Gomez Decl.) at 1390 ("I was told that SLP is affiliated with the U.S. Department of Education and works with the U.S. Department of Education."). And Defendants' Service Agreement is a classic "contract of adhesion," locking the consumer into paying fees to Student Loan Processing.US for the life of his/her loans with no way to cancel the agreement. 75 Fed. Reg. at 48,485; *see, e.g.*, Pl. SJ Ex. 46 (Kletzka Decl.) at 1371 (Company refused to cancel agreement); Pl. SJ Ex. 51 (Chang Decl.) at 1396 (same). Such practices are not generally affiliated with any refinancing services that the Defendants claim to provide and for which they are claiming an exemption from the TSR.

Defendants also disguised their fees, as do many debt relief entities described by the FTC. Defendants' "advertisements and websites offering debt relief services typically are silent . . . about how much a consumer must pay for the advertised service." 75 Fed. Reg. at 48,496. Defendants make "fee disclosures . . . in the telemarketing call [that] are contradicted by the written contract." *Id.*; *see, e.g.*, Pl. SJ Ex. 49 (Anderson Decl.) at 1385-86 (no disclosure of monthly fee during enrollment call); Pl. SJ Ex. 50 (Gomez Decl.) at 1390 (same). "As a result, consumers often enroll in [Defendants'] programs under a false impression or are confused about what they have to pay or when they have to pay it." 75 Fed. Reg. at 48,496. In addition, "[c]onsumers often are not aware that their . . . payments are taken by the [Company] as its fees and are not saved for settlement of their debt." 75 Fed. Reg. at 48,463; *see, e.g.*, Pl. SJ Ex. 48 (Bethea Decl.) at 1379 ("[The Company representative] informed me that the $39 fee did not go to SLP, but would be applied toward my student loans.").

Finally, similar to the companies described by the FTC in the Federal Register,

consumers who enroll with the Defendants often discovered that they were misled about the debt relief benefits that they would receive. For instance, some consumers were promised certain payment terms, only to later learn that the actual payment terms were worse. *See, e.g.*, Pl. SJ Ex. 47 (Latus Decl.) at 1374-75 (interest rate was higher than promised by the Company); Pl. SJ Ex. 49 (Anderson Decl.) at 1385 (same); Pl. SJ Ex. 51 (Chang Decl.) at 1395-96 (monthly loan payment was higher than promised by the Company). Indeed, far from the rosy picture that Defendants have attempted to create, many consumers report that they are not better off as a result of enrolling with the Company. *See, e.g.*, Pl. SJ Ex. 48 (Bethea Decl.) at 1380-81 ("I am stuck paying a $39 monthly fee that I thought would be reducing my student loan balance, but which is actually just being paid to SLP."); Pl. SJ Ex. 51 (Chang Decl.) at 1396 ("my monthly loan payment [went] up from $202.40 to $203.88"). Far from feeling that they have been "greatly helped" by Student Loan Processing.US, many consumers instead feel preyed upon and deceived by the Company's conduct. *See, e.g.*, Pl. SJ Ex. 48 (Bethea Decl.) at 1380 ("I feel that SLP deceived me. I was just seeking relief related to my student loan debt, but SLP took advantage of my desperation and misled me about who they are and what they do."); Pl. SJ Ex. 50 (Gomez Decl.) at 1392 ("I am very upset at how I was treated by SLP. . . . I hope SLP is not able to continue wrongfully taking money from people like me.").

## CONCLUSION

For the foregoing reasons, as well as the reasons set forth in the Bureau's motion for summary judgment, Defendants fall within the definition of "debt relief service" set forth in the TSR. Accordingly, the Court should deny the Defendants' Motion for Partial Summary Judgment on Count I of the Complaint.

Dated: January 4, 2016

Respectfully submitted,

David Rubenstein
*Deputy Enforcement Director*
Frank Kulbaski
*Assistant Deputy Enforcement Director*

/s/ Nicholas Jabbour
Nicholas Jabbour, DC Bar #500626
(Email: Nicholas.Jabbour@cfpb.gov)
Rina Tucker Harris, DC Bar #444550
(Email: RinaTucker.Harris@cfpb.gov)
Brandis C. Anderson, CA Bar #261325
(Email: Brandis.Anderson@cfpb.gov)
*Enforcement Attorneys*
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
Phone: (202) 435-7548
Fax: (202) 435-7722

Attorneys for Plaintiff
Consumer Financial Protection Bureau