JEFFREY C. BRIGGS (No. 100369)
BRIGGS LAW OFFICE
Email: jbriggs@jbriggslaw.com
6464 Sunset Blvd.
Suite 715
Hollywood, CA 90028
Phone: (323) 461-5400
Fax: (323) 908-7275

Attorney for Defendants Irvine WebWorks, Inc., dba Student Loan Processing.US, and James Krause

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION**

Consumer Financial Protection Bureau,

Plaintiff,

vs.

Irvine WebWorks, Inc., d/b/a Student Loan Processing.US, et al.,

Defendants.

CASE NO. 8:14-cv-01967-JVS-DFM

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITON TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Hearing Date: January 25, 2016
Hearing Time: 1:30 pm
Hearing Place: Crtrm. 10C

(*Hon. James V. Selna, US District Judge, presiding*)

(Krause and Gill Opposing Declarations, Statement of Genuine Disputes, and Objections to Plaintiff's Evidence filed concurrently herewith)

Defendants Irvine WebWorks, Inc., dba Student Loan Processing.US, and James Krause respectfully submit this Memorandum of Points and Authorities in opposition to plaintiff's motion for summary judgment.

# TABLE OF CONTENTS

I. Summary of Argument 4

II. Background Facts 4

A. The Student Loan Debt Crisis and DOE Direct Consolidation Loans 4

B. SLP's Business 5

C. SLP is an Advocate for Student Loan Debtors 7

III. Plaintiff's Burden on Summary Judgment 8

IV. SLP is Not a "Debt Relief Service" Subject to the Prohibition on Collecting An "Advance Fee" 9

V. Genuine Disputes Preclude Summary Judgment Regarding Plaintiff's "Government Affiliation" Claims 12

VI. Genuine Disputes Preclude Summary Judgment Regarding Plaintiff's "Fee Misrepresentation" Claims 15

VII. Plaintiff is Not Entitled to its Requested Remedies on Summary Judgment 18

VIII. Conclusion 18

TABLE OF AUTHORITIES

Anderson v. Liberty Lobby, Inc.,

477 US 242, 255, 106 S.Ct. 2505, 2513 (1986) 8

Interstellar Starship Services, Ltd. v. Epix, Inc.,

184 F.3d 1107. 1109 and 1111-12 (9th Cir. 1999) 13

FTC v. Think Achievement Corp.,

144 F. Supp. 2d 993 (N.D. Ind. 2000) 13

FTC v. Federal Loan Modification Law Center, LLP,

No. 0900401-CJC(MLGx) (C.D. Cal. Nov. 17, 2010) 13

Nunez v. Superior Oil Co.,

572 F.2d 119, 126 (5th Cir. 1978) 9, 16

Southern Calif. Gas Co. v. City of Santa Ana,

336 F.3d 885, 888 (9th Cir. 2003) 8

Fed. R. Civ. P 56(a) 8

12 U.S.C. §5531(c) and (d) 17

15 U.S.C. §6102 9

16 CFR 310 9

16 C.F.R. §310.4(a)(5)(i) 9

Telemarketing Sales Rule; Final Rule, III.B "Section 310.2: Definitions," 75 Federal Register, No. 153, at 48466 n. 123 (8/10/10)(https://www.gpo.gov/fdsys/pkg/FR-2010-08-10/pdf/2010-19412.pdf#page=9 ) 10

Telemarketing Sales Rule; Final Rule, I.C "Overview of Debt Relief Services," 75 Federal Register, No. 153, at 48459-48464 (https://www.gpo.gov/fdsys/pkg/FR-2010-08-10/pdf/2010-19412.pdf ) 11

# I

# SUMMARY OF ARGUMENT

As set forth in the separate motion for partial summary judgment on Count I of the Complaint filed by defendants Irvine WebWorks, Inc., d/b/a Student Loan Processing.US, and its President and sole owner James Krause (collectively herein, "SLP"), SLP does not operate a "debt relief service" as defined by the federal Telemarketing Sales Rule ("TSR"), and thus SLP has not violated this rule by charging its clients a fee before actually providing them with the benefit of some of its services. The regulators' footnote explanation that one who arranges for entirely new loans, as SLP undisputedly does, is not engaged in a "debt relief service" requires entry of partial summary judgment on plaintiff's "advance fee" claim in Count I—but against plaintiff and in favor of defendants. Plaintiff's motion for summary judgment as to Count I should be denied.

All of plaintiff's other Counts, both under the TSR and under the Consumer Fraud Prevention Act ("CFPA") rest on two questions—(1) Whether SLP has misrepresented itself as having an affiliation with the US federal government (specifically, with the Department of Education ("DOE" here for consistency with SLP's own motion and exhibits relating to its business, and "ED" in plaintiff's papers)), and (2) whether SLP has misrepresented the monthly maintenance fee it charges its clients. Plaintiff bears the burden of proof on both of these issues, both depend on genuinely disputed facts and credibility, plaintiff cannot meet its heavy burden, and none of these Counts should be decided on summary judgment.

# II

# BACKGROUND FACTS

## A. The Student Loan Debt Crisis and DOE Direct Consolidation Loans

Total US college student loan debt stands at approximately $1 trillion, of which some $870 billion is owed directly to the US government due to its guarantee of most such loans. (Krause Decl., ¶22) Many student loan debtors are not making

any payments while interest continues to accrue and their debt rises. (Id., ¶2) Outstanding student loan debt obligations are a ticking financial timebomb for the US government and individual student loan debtors alike--and ultimately for the American taxpayer.

In 2010, DOE began offering all federally insured student loan debtors a chance to consolidate their various outstanding student loans into a single new loan issued directly by DOE—student loan debtors typically have several loans—to encourage greater payment. (Krause Decl. ¶28) This new DOE consolidation loan offers the convenience of a single monthly repayment and various affordable repayment programs, for example monthly payments based on the debtor's income level without regard to the balance and accumulating interest. (Krause Decl., ¶3) Furthermore, these new DOE consolidation loans offer loan balance forgiveness after 10 or 20-25 years (public service employees and all others, respectively) for those who timely make their new DOE loan payments. (Id., ¶4)

**B. SLP's Business**

Defendant Krause founded SLP in May 2011 because of difficulties encountered by student loan debtors in obtaining DOE consolidation loans without assistance. (Krause Decl., ¶5; see also id. at ¶23, Ex. E, and Gill Decl. ¶¶3-4) Among other things, he found that the DOE loan consolidation programs were not well known to student loan debtors (Krause Decl., ¶6; see also ¶23, Ex. E and Gill Decl. ¶2), that the many DOE programs and criteria were difficult to fully understand and the application process time consuming, thus encouraging debtor procrastination (id., ¶¶ 7-8; see also ¶23, Ex. E, and Gill Decl. ¶3-4), that DOE and its third-party loan servicers are prone to delay and error (id., ¶9; see also ¶23, Ex. E and Gill Decl. ¶5),[1] and that many DOE consolidation repayment programs

[1] DOE consolidation loan third-party servicers are paid, of course, based on student loan debtor repayments, and thus have an incentive to make "mistakes" in assigning debtors to higher payment plans than what they apply for. Plaintiff recently has recognized the many problems encountered by student loan debtors in seeking DOE loan consolidation, including due to servicer errors. (See Krause Decl. ¶23, Ex. E)

depend on a debtor's income or other personal circumstances (marriage, divorce, children, job loss, job promotion, etc.) requiring regular provision of "re-certification" materials to DOE that many debtors have trouble accomplishing without help (risking loss of consolidation benefits including time counted toward eventual forgiveness). (Id., ¶10; see also ¶23, Ex. E, and Gill Decl. ¶6) Krause also learned that DOE occasionally came out with a new repayment program that could be beneficial to those who already had consolidated with DOE but could benefit further from the new plan. (Id., ¶7; see also Gill Decl. ¶3)

Accordingly, SLP provides assistance to student loan debtors in learning about DOE consolidation loans and then applying for them and following up as required. (Krause Decl., ¶11; Gill Decl. ¶¶4 and 7) Until early 2014, SLP acquired lists of likely student loan debtors with at least $25,000 in student loan debt and sent them a direct mail piece informing them of "the new law . . . regarding federal student loans including TOTAL FORGIVENESS in some circumstances" (all caps in original) and listing the inarguable benefits of "lower monthly payment, lower interest rates, forgiveness programs, and increase[d] . . . monthly cash flow." (Krause Decl., ¶12, Ex. A)[2] Its website explained the many benefits of DOE loan consolidation and offered to "Let us do the work!" (Id., Ex. B) Those who called in response to SLP's direct mail piece were told specifically about DOE's loan consolidation program, that SLP could help them handle the application and documentation process, and with a few pieces of information SLP could tell them on that first call which new loan and repayment programs they qualified for and what their new monthly payment could be. (Id., ¶13, Ex. C) They also were told about SLP's ongoing service in regard to the annual re-certification process usually required for the life of the loan. (Id.) To the extent SLP made outgoing calls to prospective clients, they were told the same things. (Id.)

---

[2] Since early 2014, SLP has relied exclusively on referrals from satisfied clients. (Krause Decl., ¶13)

Student loan debtors expressing interest in SLP's help while on the phone with SLP are given immediate electronic access to a copy of SLP's Service Agreement, which SLP reviews with the client. This agreement describes SLP's business as "arranging Federal Student Loan Consolidation Services and Processing provided by programs offered through [DOE] for clients with federal student loans," and identifies its services as analysis of the client's federal student loan debt situation, research of potential loan restructuring options, arranging a consolidation loan through DOE, continuing to manage that loan over time to ensure client receipt of "maximum benefits offered by DOE consolidation programs," and preparing and filing all necessary DOE paperwork. (Krause Decl., ¶15, Ex. D) If the prospective client approves and signs the agreement, s/he provides immediate payment of SLP's enrollment fee and agrees to an ongoing monthly payment to SLP thereafter. Both the enrollment fee and one or more of the first monthly SLP fee payments were paid by clients only after reviewing and signing the Service Agreement, but before their DOE consolidation loan agreement was in place and before the first payment on that new loan was made. (Krause Decl., ¶¶16-17; Gill Decl. ¶9)[3]

**C. SLP is an Advocate for Student Loan Debtors**

SLP has assisted some 5,400 student loan debtors in obtaining DOE consolidation, typically lowering their monthly payments by a random average of 72%. (Krause Decl., ¶18) In addition, those in that random sample who qualify for public service forgiveness will, if they continue to pay with the regular assistance SLP provides, achieve forgiveness after ten years and save $1,337,343 in forgiven loan balances, and those on longer forgiveness tracks also would reap savings. (Id.) SLP was, moreover, the first source of information most of its clients ever received about the availability of DOE consolidation loans and benefits. (Id., ¶6; Gill Decl. ¶2) Some clients who tried to complete the DOE process on their own after first

[3] These are the "advance fee" payments plaintiff attacks in Count I of the Complaint.

hearing about consolidation loans from SLP eventually returned to SLP for help. (Id., ¶8; Gill Decl. ¶4) SLP has helped as many as a quarter of its clients correct DOE processing errors that led to their being assigned to a more expensive payment plan than to which they were entitled. (Id., ¶20) Most of SLP's clients comply with the terms of their new loan and do not "drop out" of the DOE repayment program SLP helped them obtain. (Id., ¶19) SLP is in regular communication with its clients about changes in circumstances that could impact their repayment plan, and new potentially more beneficial DOE plans as they become available. (Id., ¶21) It is safe to say that most of SLP's clients would, but for SLP, still be in default or forbearance on their loans while their original student loan balances continued increasing to levels even more crushing to them and to the economy.

In short, SLP has not just greatly helped its clients—it has helped DOE and the American taxpayer.

## III

## PLAINTIFF'S BURDEN ON SUMMARY JUDGMENT

Plaintiff bears the "heavy burden" of both production and persuasion that no reasonable trier of fact could find other than for plaintiff after all of SLP's evidence is believed and all inferences are drawn in its favor. Fed. R. Civ. P 56(a); Southern Calif. Gas Co. v. City of Santa Ana, 336 F.3d 885, 888 (9th Cir. 2003); Anderson v. Liberty Lobby, Inc., 477 US 242, 255, 106 S.Ct. 2505, 2513 (1986). Of particular importance in a case like this—involving alleged "implications" of or "confusion" about a government affiliation, alleged "misrepresentations" involving not disclosure itself but whether the undisputed disclosure was "sufficient" for college-educated consumers to understand, and the credibility of just a handful of witnesses (6) out of thousands of SLP clients (5,400)—is the maxim that summary judgment is improper where a jury must make determinations requiring "experience with the mainsprings of human conduct" and with "reference to the data of practical human

experience." Nunez v. Superior Oil Co., 572 F.2d 119, 126 (5th Cir. 1978).

## IV

## SLP IS NOT A "DEBT RELIEF SERVICE" SUBJECT TO THE PROHIBITION ON COLLECTING AN "ADVANCE FEE"

Count I of the Complaint arises under Section 6102(a) of the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §6102, which authorizes the FTC to prescribe rules prohibiting deceptive and abusive telemarketing acts or practices. The result is the Telemarketing Sales Rule at 16 CFR 310 ("TSR").

Plaintiff asserts in Count I a violation of Section 310.4(a)(5)(i) of the TSR, which defines an "abusive telemarketing act or practice" as including "[r]equesting or receiving payment of any fee or consideration for any *debt relief service* until and unless" the debtor has signed a new debt agreement and has made at least one payment under that new agreement (and the debt relief service's fee meets certain proportional criteria). 16 C.F.R. §310.4(a)(5)(i)(emphasis added). Plaintiff contends that SLP has violated this "advance fee" rule. (Complaint ¶¶43 and 45-46.)

There is no dispute that SLP charges a fee prior to the client's execution of a new loan and first payment on that new loan. But whether SLP has violated the rule against such "advance fees" depends on whether it is a "debt relief service" as defined by the TSR. It is not, and as a matter of law (hence SLP's own motion for partial summary judgment on Count I to be heard concurrently with plaintiff's motion here).

Plaintiff's brief accurately recites the TSR and its definitions. But it too blithely dismisses the FTC's plain statement that a "debt relief service"

> is not intended, however, to cover services or products that offer to refinance existing loans with

> a new loan as a way of eliminating the original debts, as such a process would result in a new extension of credit that replaces the existing debts rather than altering them.

Telemarketing Sales Rule; Final Rule, III.B "Section 310.2: Definitions," 75 Federal Register, No. 153, at 48466 n. 123 (8/10/10)[4]

In this important definitional footnote, the FTC has made it clear that the prohibition on a "debt relief service's" charging of an advance fee "is not intended to cover" a service that provides "a new loan" that "replaces" existing debts. *This is exactly what SLP does*: A DOE loan is an entirely new loan, with a new loan agreement that replaces the pre-existing student loan debts. (Krause Decl., ¶17) The new loan terms are not "negotiated," they are established by DOE and not subject to change from the terms presented in DOE's various repayment programs. Nor are the pre-existing loan balances "settled" because the outstanding balance carries over to the new single consolidation loan. (Id.)

Plaintiff seeks to avoid the clear import of this definition by trying to re-define the nature of SLP's services. Plaintiff contends that SLP "represents" that it offers services other than "loan consolidation" and that it in fact does so. However, all of the services SLP offers in fact are dependent on securing its clients a new DOE loan. (Krause Decl., ¶25; Gill Decl. ¶11) A basketball player might advertise that he is a "great passer," but that does not make him a football player when you meet him and he invites you only to play basketball.

What SLP does is secure entirely new DOE loans for student loan debtors in order to make them eligible for advantageous DOE repayment plans. It clearly describes those loans and plans before enrolling any client: SLP's script for handling all interested prospective clients (Krause Decl., ¶13 and Ex. C ("Inbound

[4] https://www.gpo.gov/fdsys/pkg/FR-2010-08-10/pdf/2010-19412.pdf#page=9

Call Script)) specifically describes SLP's services only in relation to DOE's consolidation loan program in the context of being a third-party helping to make simple what the government has made "more complicated," comparing SLP to a lawyer who helps someone obtain social security benefits or one who helps someone else file her tax returns, and stating that SLP will help its clients "apply for the [DOE student loan consolidation program] benefits on your behalf with the Department of Education." The *very few* occasions on which SLP has provided services without such a loan were in response to consumers who asked SLP for other help only after learning from SLP they were not eligible for new DOE loan help immediately. (Id.)

The FTC's concern in creating the "advance fee" prohibition, moreover, was about providers of "debt management plans," "debt settlement services," and "debt negotiators." See Telemarketing Sales Rule; Final Rule, I.C "Overview of Debt Relief Services," 75 Federal Register, No. 153, at 48459-48464 (https://www.gpo.gov/fdsys/pkg/FR-2010-08-10/pdf/2010-19412.pdf ). Each of those kinds of services is, in fact, involved in some degree of renegotiation, settlement, or alteration of a debtor's pre-existing debts (and not involved in obtaining new loans that replace existing debts). Because of the nature of these kinds of services, the FTC found that debtors employing such services frequently never obtained new terms and only increased their debt load due to the addition of the provider's fees. The FTC also found that many debtors "dropped out" of these kinds of services, and that benefits, if obtained at all, were secured months or even years after engaging one of these services and paying its fees all along.

None of these risks attend SLP's assistance to student loan debtors in obtaining a DOE consolidation loan. All of SLP's clients obtain such a loan, or they pay SLP nothing. (Krause Decl., ¶¶ 18-19) All of SLP's clients secure a substantial reduction in their monthly payment obligation or overall payoff amount after forgiveness—even with SLP's fees included. (Id.) Most of SLP's clients

maintain their new payments, and thus do not "drop out" of their DOE loan (even if they do try to stop paying SLP for its help in obtaining that new loan). (Id.) All who maintain their payments eventually will achieve loan forgiveness regardless of how much of the full balance they have paid off. (Id.)

The FTC rulemakers knew what they were doing when they specifically excluded new loan providers from "debt relief services" subject to the prohibition on advance fees. Plaintiff is not entitled to summary judgment on Count I; defendants are, on their own separate motion to be heard concurrently herewith.

## V

## GENUINE DISPUTES PRECLUDE SUMMARY JUDGMENT REGARDING PLAINTIFF'S "GOVERNMENT AFFILIATION" CLAIMS

Plaintiff contends that SLP violated both the TSR and the CFPA by allegedly misrepresenting an affiliation with DOE, a federal government agency.[5] Viewing the evidence most favorably for SLP, as the court must, these claims must be tried by a jury.

Plaintiff first contends that it is "self-evident" that SLP's original and new logo is similar enough to DOE's to cause likely consumer confusion, as does SLP's use of ".US" at the end of its company name; SLP's statements that it "works with" DOE; SLP's use of a "bald eagle" stamp, the words "Official Business," and a citation to the US Code prohibiting mail tampering on its mailer; prior SLP Service Agreement references to DOE; and failure to expressly disclaim such affiliation.

It should be disturbing to see the federal government claim for its exclusive use such commonly non-governmental business ornamentations as a "gold and blue round 'seal,' the image of a tree, a stamp bearing the image of an eagle imprinted by a mailing house (Krause Decl., ¶33), the word "official" in relation to

[5] At least some of SLP's consumer transactions are exempt from this prohibition under the TSR if SLP is not a "debt relief service" as SLP argues in its own motion for partial summary judgment.

"business," and a federal statute applicable to everyone. One should pause to wonder where that ends—does everyone who seeks to raise money for our military veterans need to be concerned that its use of US military symbols will cause consumer confusion about an affiliation with the federal government? That is not the law.

Neither the "Postal" case (FTC v. Think Achievement Corp., 144 F. Supp. 2d 993 (N.D. Ind. 2000)) nor the unpublished "Federal Loan Modification" case (FTC v. Federal Loan Modification Law Center, LLP, No. 0900401-CJC(MLGx) (C.D. Cal. Nov. 17, 2010) cited by plaintiff is apposite. In the former, it is widely known that the "Post Office" is a uniquely federal government function, and the defendant's ads specifically referred to that federal function in their most prominent feature. In the latter, again it was the use of "federal" in the company's name, and in the context of vulnerable homeowners, that carried the summary judgment day. Here, the closest analogy to those cases is SLP's use of ".US" in its name—but the difference is that (a) it is a perfectly acceptable and freely available domain name extension, and (b) the government already has its own well-known and exclusive domain name extension ".org." (Krause Decl., ¶31-32 and Exhs H and I) And all of SLP's clients are, by definition, college educated and less vulnerable to "affiliation manipulation" than homeowners of all stripes needing relief. "Likelihood of confusion" issues are said in this Circuit to be so "intensely factual" as to render summary judgment particularly "disfavored." Interstellar Starship Services, Ltd. v. Epix, Inc., 184 F.3d 1107. 1109 and 1111-12 (9th Cir. 1999)(whether internet domain name is confusingly similar to a trademark not susceptible of summary judgment). So it is here. "Likely confusion" is a jury issue.

Next, as to alleged "actual" confusion, plaintiff plainly has tainted the water it asks this court to carry for it—SLP has evidence that DOE and its servicers have told consumers to stop paying SLP and to complaint to BBB, the FTC, and others

that they thought SLP was affiliated with DOE (Gill Decl. ¶12) This is not, furthermore, mere paranoia[6] now that every declarant offered by plaintiff uses the "affiliation" word. Those declarants, moreover, otherwise lack credibility as some have been disingenuous—to say it kindly—on other matters, and at best vague as to what sort of "affiliation confusion" they suffered and when. (Gill Decl., ¶16) In fact, the stronger evidence is that SLP is very clear about its instructions to its employees on this subject, and never has heard of anyone at SLP stating such affiliation or any consumer stating it to SLP—that potential clients sometimes inquire on the subject only shows they have a question, not that they actually are confused. (Krause Decl. ¶¶37-38; Gill Decl. 12-13) Indeed, the Service Agreement materials and SLP's telephone script demonstrate that anyone listening and reading along with SLP's representative while enrolling could not have any confusion about any such affiliation—the distinction is made very clear. (Krause Decl. ¶¶13 and Ex. C, 15 and Ex. D, and 38; Gill Decl. ¶¶ 12-13 and 16)

No alleged actual consumer confusion can be said to have been "reasonable" as a matter of law in the face of this contrary evidence, which must be given heaviest weight on this motion. Nor can it be said to be "material" as a matter of law—whatever confusion these declarants or other consumers may claim they had at the time they contacted SLP, the enrollment process certainly should have dispelled it. (Krause Decl. ¶¶13 and Ex. C, 15 and Ex. D, and 38; Gill Decl. ¶16)[7]¶

To the extent plaintiff seeks to prove intentional confusion by SLP, Mr. Krause has explained each of his actions allegedly "intended" to cause confusion sufficiently to put that allegation to rest for summary judgment. (Krause Decl. ¶¶30-36) On this motion, his explanations are to be credited—let a jury decide.

Finally, even if all this alleged likely or actual confusion were true, there is a genuine dispute as to the clients to whom any remedy for these violations would

---

[6] See n. 1, supra.
[7] Plaintiff's Declarant Anderson, for example, claims only to have been "confused" *after* she had been enrolled for awhile. (Gill Decl., ¶16 re "Anderson Declaration")

apply. SLP already changed its logo, has included an express disclaimer on its website Home Page as requested by DOE (and without further complaint) for some time, stopped sending any mailers at all, and deleted the alleged offending references to DOE in its Service Agreement, all at various times. (Krause Decl. ¶¶30-36) Despite plaintiff's suggestion to the contrary, not to mention the uncanny uniformity of its declarants in this regard, not everyone could have been confused by the same things at the same time.

**VI**

**GENUINE DISPUTES PRECLUDE SUMMARY JUDGMENT REGARDING PLAINTIFF'S "FEE MISREPRESENTATION" CLAIMS**

Plaintiff's "monthly fee misrepresentation and deception" claims fail upon review of SLP's telephone scripts and Service Agreement.

In the telephone enrollment script, SLP specifically advises a client interested in proceeding what his new monthly payment will be in total, inclusive of SLP's monthly fee, because that is the number most clients are most interested in—the amount of money they will save each month. (Krause Decl., ¶13 and Ex. C at "Inbound Call Script") But the client also specifically is told about the $39 monthly maintenance fee at that time, and that it is included in the quoted new monthly payment number. (Id.)

If the prospective client wants to proceed, she then is provided a copy of the SLP Service Agreement package and each part is reviewed with her by the SLP representative. (Krause Decl. ¶15) This package contains first a cover letter that says the "Recurring Monthly Maintenance Fee" will be charged "until the [DOE] loan terms have been satisfied." (Krause Decl. ¶15 and Ex. D) Again on that page, ass in the telephone script, the total new monthly cost is provided because that number is of most interest to most clients. (Id.) Next is the "Client Verification Page," which under "Program Information" first lists the total new monthly payment, and *right underneath* that number says, "Monthly Cost is based upon SLP

Monthly Maintenance Fee of $39.00 and the Estimated DOE Payment." (Id.) Then comes the Service Agreement, which explains in paragraph 3—which is read to the client verbatim (id.)—that "A monthly maintenance fee as listed on Service Agreement Client Verification Page is included within the Estimated New program Monthly Cost, and is charged by SLP . . . and continuing monthly until the DOE Consolidation Loan is paid in full, or is discharged . . . ." (Id.) No fee is charged at all, moreover, until the client signs the agreement after reviewing it. (Gill Decl. ¶9)

These several steps accomplish the three things plaintiff claims are "misleading" to reasonable college-educated consumers prior to their enrollment: They (1) disclose the separate amount of SLP's monthly fee; (2) disclose to whom the payment of the monthly fee goes (SLP) as distinct from the DOE loan payment; and (3) disclose how long the monthly fee will be charged by SLP.

Plaintiff's declarants' statements that they were never told about the monthly maintenance fee is difficult to swallow in the face of these documents reviewed with every SLP prospective client—and in the face of their other inconsistencies. (Gill Decl., ¶16) Other supposed complaints submitted by plaintiff on this subject are hearsay, and are equally difficult to fathom in any event, especially on summary judgment, for the same reasons as above—these are college-educated people that SLP is walking carefully through a contract. A jury should decide whether these complaints have a reasonable basis, or—in light of what jurors can consider in regard to "the data of practical human experience" (Nunez, supra, 572 F.2d at 126)—whether these are people who treat their obligations rather like too many treat their student loan debt, that is, merely by seeking any excuse to avoid it.[8]

Finally, Section 1031 of the CFPA is highly instructive, though its import seemingly is ignored by plaintiff despite its enforcement role:

---

[8] Compare SLP client testimonials from happy clients. (Krause Decl. ¶14, Ex. F)

> The Bureau shall have no authority under this section to declare an act or practice in connection with . . . the offering of a consumer financial product or service, to be unlawful on the grounds that such act or practice is unfair, unless the Bureau has a reasonable basis to conclude that—
>
> (A) the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers; and
>
> (B) such substantial injury is not outweighed by countervailing benefits to consumers or to competition.
>
> . . .
>
> The Bureau shall have no authority under this section to declare an act or practice abusive in connection with the provision of a consumer financial product or service, unless the act or practice—
>
> (1) materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service; or
>
> (2) takes unreasonable advantage of—
>
> (A) a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service; (B) the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service; or (C) the reasonable reliance by the consumer on a covered person to act in the interests of the consumer.

12 U.S.C. §5531(c) and (d).

Happily, the government took a break from Nanny State regulation when it wrote these limits on enforcement into the CFPA. But for our purposes, the import is that words like "not reasonably avoidable," "not outweighed by countervailing benefits to consumers," "unreasonable advantage," and "inability of the consumer to protect [himself]" all require inferences made in SLP's favor, and thus preclude summary judgment. No reasonable college-educated adult owing $25,000 or more

in student loan debt should be misled by SLP's enrollment process and materials—but whether they might be is a matter for the jury.

**VII**

**PLAINTIFF IS NOT ENTITLED TO ITS REQUESTED REMEDIES ON SUMMARY JUDGMENT**

The above-referenced Section 1031 of the CFPA also precludes the sweeping relief plaintiff seeks. For example, plaintiff seeks restitution without any regard for "countervailing benefits to consumers" (like an average 72% monthly savings, or the participation of many student loan debtors in programs DOE presumably does really want them to sign up for (Krause Decl., ¶¶6, and 18-22)). Until a jury has had a chance to consider Section 1031 and whether plaintiff should even have brought this case, the court is not able to fashion any appropriate relief.

Nor has plaintiff submitted evidence supporting, for example, penalty mitigating factors such as defendants' financial resources and good faith, the gravity of the violation, the severity of the loss to consumers, prior violation history, and "such other matters as justice may require." 12 U.S.C. § 5565(c)(3). As to no such remedial issues has plaintiff met its initial burden of production—despite ample opportunity to do so (Krause Decl. ¶39)—let alone its burden of ultimate persuasion.

**VIII**

**CONCLUSION**

For the foregoing reasons, SLP respectfully submits that plaintiff's motion for summary judgment should be denied.

Dated: January 4, 2016

JEFFREY C. BRIGGS

By: /S/
Jeffrey C. Briggs
Attorneys for Defendants Irvine WebWorks, Inc., dba Student Loan Processing.US, and James Krause