JEFFREY C. BRIGGS (No. 100369)
BRIGGS LAW OFFICE
Email: jbriggs@jbriggslaw.com
6464 Sunset Blvd.
Suite 715
Hollywood, CA 90028
Phone: (323) 461-5400
Fax: (323) 908-7275

Attorney for Defendants Irvine WebWorks, Inc., dba Student Loan Processing.US, and James Krause

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

Consumer Financial Protection Bureau,

Plaintiff,

vs.

Irvine WebWorks, Inc., d/b/a Student Loan Processing.US, et al.,

Defendants.

CASE NO. 8:14-cv-01967-JVS-DFM

DEFENDANTS' STATEMENT OF GENUINE DISPUTES IN RE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Hearing Date: January 25, 2016
Hearing Time: 1:30 pm
Hearing Place: Crtrm. 10C

(*Hon. James V. Selna, US District Judge, presiding*)

(Notice of Motion for Partial Summary Judgment and Supporting Memorandum of Points and Authorities and Declarations of James Krause and Thomas Gill filed concurrently herewith)

Defendants Irvine WebWorks, Inc., dba Student Loan Processing.US, and James Krause ("SLP") respectfully submit that the following assertions by plaintiff of "uncontroverted facts" ("UF") are genuinely disputed in regard to plaintiff's motion for summary judgment:

**UF 18:** To access certain repayment plans, it is sometimes, but not always, necessary for a borrower first to combine his/her eligible Federal student loans into a Direct Consolidation Loan.

DISPUTED: All of SLP's clients achieve either multiple loan consolidation, with a very few involving some form of "re-consolidation" or eventual consolidation through the DOE and its servicers (Krause @ 25); SLP serves student loan debtors with approximately $25,000 or more in federal student loan indebtedness, such a debt amount is always comprised of more than one student loan, and SLP's clients always have multiple student loans and thus require "consolidation" through the DOE Direct Loan program to secure the benefits of its repayment and forgiveness plans. (Krause @ 28; Gill @ 11); the evidence cited by plaintiff does not support the stated proposition.

**UF 21**: The repayment program application and the application for a Direct Consolidation Loan separately require approximately 30 minutes each to complete.

DISPUTED: 8. Completion of the DOE application forms takes an unassisted consumer considerable time, certainly well more than 30 minutes, to first familiarize oneself with the voluminous DOE program information available (downloading alone could take 30 minutes), collect substantial personal financial information from one's own records, decide what programs one qualifies for and which best meets one's needs, read the directions for completing the appropriate forms for the chosen program, and then find and input the required information. (Krause @ 8; Gill @ 4)

**UF 115**: After attempting to collect the enrollment fee, the script then directs the employee to "email over the service agreement for [the consumer's] signature."

DISPUTED: SLP collects payment *information* before the client actually enrolls because it is part of the Service Agreement, which provides

authorization for SLP to collect the enrollment fee; the enrollment fee is never actually *collected* by SLP until the client has reviewed the Service Agreement and its component parts with SLP, and has provided SLP with the signed agreement. (Krause @ 15-16; Gill @ 9)

**UF 121**: SLP employees have directly misrepresented to some consumers that they are agents of the U.S. Department of Education or are affiliated with that agency in some capacity.

DISPUTED: SLP employees are instructed to not claim any affiliation with DOE, and indeed that SLP is an advocate for the client in dealing with the complicated, lengthy, and error-prone DOE loan consolidation process, and that SLP is there to help clients get what they are entitled to by simplifying the process, much like a tax preparer or a lawyer (as reflected in SLP's Inbound Call Script in Krause Exhibit C). (Krause @ 37-38; Gill @ 13) Those responsible for monitoring SLP's call handlers for quality control have never heard any SLP employee tell anyone that SLP is affiliated with DOE or the federal government. (Krause @ 37-38; Gill @ 13) Plaintiff's cited declarations are rife with discrepancies with their files, and none of the recorded calls support any claims they were told by SLP that it was affiliated with DOE or the federal government; each client receives and reviews and is read parts of the component parts of SLP's Service Agreement (Krause Ex. D), which make clear that SLP's monthly maintenance fee is separate from the client's DOE loan payment. (Gill @ 16) SLP has been told by some clients that DOE and its servicers and other government officials have told them they can avoid paying our fees by saying they believed we are so affiliated. (Krause @ 37; Gill @ 12)

**UF 122**: Other consumers believe that SLP employees are agents of the U.S. Department of Education or are affiliated with that agency in some capacity based

on SLP's marketing materials (including the logo used by SLP) or statements made during the enrollment call.

DISPUTED: See UF 121 dispute above. Furthermore, none of plaintiff's declarants has pointed to any specific language or logo in any SLP materials as a basis for believing SLP is in fact affiliated with the government generally or DOE specifically. (Krause @ 37; Gill @ 12).

**UF 123**: Consumers indicated that a driver of their decision to use the Company was that it had the imprimatur of the Federal Government, which gave the Company greater legitimacy than it would have otherwise had.

DISPUTED: There is only one cited declarant, and she does not point to any specific wording in the SLP mailer that led her to believe SLP was "affiliated with the Federal Government," and does not say the logo looked like the DOE logo, just like a "Government logo" without explanation; furthermore, her declaration is false in other respects as to what she claims was or was not told her. (Gill @ 16 re "Bethea Declaration") SLP has been told by some clients that DOE and its servicers and other government officials have told them they can avoid paying our fees by saying they believed we are so affiliated. (Krause @ 37; Gill @ 12)

**UF 126**: Defendants' mailer includes the words "Official Business" or a citation to the U.S. Code even though Defendants acknowledge that such language could "possibly" lead someone to believe that the mailer is from a government agency.

DISPUTED: Anything is "possible," but SLP has never been told that anyone believed the cited language made them think the mailer came from a government agency. (Krause @ 37; Gill @ 12)

**UF 138**: In or around September 2012, and only after receiving the letter from ED, a non-prominent disclaimer was added SLP's website homepage stating that Student Loan Processing.US is not affiliated with ED.

DISPUTED: The disclaimer requested by DOE is prominent on SLP's website because it is on the Home Page and one need not click through to another page to see it. (Krause @ 29 and Ex. G)

**UF 140**: Student Loan Processing.US's logo (displayed below on the left) shared several similarities with the U.S. Department of Education seal (displayed below on the right), including the outer spherical gold border, inner spherical gold border, tree "growing" from a base, and medium blue shading between the borders with white text.

DISPUTED: The depicted logos also have a number of dissimilarities, including the writing, the prominent American Flag, the very different trees, the obscuring of the tree by the foreground flag, and other differences that make them dissimilar, and "seals" are virtually always round and are not exclusive to the government.

**UF 141**: At least some consumers contacted ED about SLP's original logo expressing that they had mistaken SLP's logo for ED's seal and/or assumed a relationship between the SLP and ED because of the similarities between the symbols.

DISPUTED: *Objection—SJ Ex. 23 is hearsay as to what "some consumers" told DOE, and the letter writer's statement to that effect lacks foundation*. SLP has found no record of anyone telling it they thought we were affiliated with DOE or the government because of any SLP logo. (Krause @ 30)

**UF 143**: While the tree has been removed from SLP's logo and replaced by a gold shield and two American flags, the new SLP logo still shares similarities with ED's seal, including the medium blue shading between the borders with the white text, as well as the inner and outer spherical gold border, and continues to resemble a government seal.

DISPUTED: The depicted logos now have an even greater number of dissimilarities, and "seals" are virtually always round and are not exclusive to the government. DOE did not complain about SLP's new logo in response to SLP's inquiry. (Krause @ 32)

**UF 146**: Some inbound and outbound enrollment calls began with SLP representatives telling the consumer that he/she is "prequalified" for Federal student loan forgiveness programs that can reduce his/her monthly payment and possibly lead to forgiveness, even though SLP had not done anything, at the time of that conversation, to determine if the consumer is actually qualified for the program, and Student Loan Processing.US is not in a position to "prequalify" anyone for ED repayment plans.

DISPUTED: SLP bought lists of likely student loan debtors with approximately $25,000 or more in total debt and sent those debtors a direct mail piece because they had been *prequalified* as SLP's target consumers. (Krause @ 12)

**UF 150**: Paragraph 17 of the first version of SLP's Service Agreement stated that the agreement could "only be modified or amended by a written agreement signed by a corporate officer of SLP and DOE," even though ED has never had a role in any modification of the agreement.

DISPUTED: SLP prepared this language as a reference to the fact that the consolidation loan SLP would secure for the client, and thus the basis for SLP's fee as set forth in the agreement (refunded if for some reason the DOE consolidation loan was not obtained), could not be changed without DOE's approval, which is true—no loan changes can be made without DOE approval. (Krause @ 35)

**UF 151**: Likewise, Paragraph 18 of the first version of SLP's Service Agreement included a paragraph entitled "Legal Authorization Form," where the consumer was advised that the form will "serve to acknowledge that Client has authorized . . . SLP

. . . to act on their behalf to manage their student loan portfolio." The sentence that followed read "This is in accordance with the Department of Education (DOE)," without any clarification about what is meant by the sentence.

DISPUTED: This language accurately reflects the fact that DOE requires SLP to have something in writing from the client authorizing SLP to so communicate on the client's behalf. (Krause @ 36)

**UF 152**: Even when responding to consumer complaints, Defendants misrepresent the relationship between Student Loan Processing.US and ED by claiming that SLP "works directly with" or "works with" ED.

DISPUTED: SLP "works with" the DOE in a number of respects, from filing the application and re-certification forms to correcting DOE and DOE servicer processing and assignment errors and as otherwise recited above. (Krause @ 7-11, 29; Gill @ 3-7)

**UF 156**: The enrollment script does not include any language directed to the up to 50% of SLP consumers who are seeking to enroll in an income-driven repayment plan that would require zero payment toward their Federal loan balance. As a result, the employee is to tell such a consumer that his/her new program payment would be "only $39 per month" in the specific ED repayment plan, even though the entire $39 would only be payment as a monthly maintenance fee to Student Loan Processing.US (with no payment being made to the consumer's loan).

DISPUTED: As plaintiff acknowledges in UF 157, SLP's script does tell the SLP call handler to separate the SLP monthly fee from the loan repayment amount. Moreover, the distinction is clear from the various components of the SLP Service Agreement. (Krause @ 15 and Ex D; Gill @ 16)

**UF 157**: The enrollment script later directs the employee to separately disclose SLP's recurring monthly maintenance fee, including the amount, but the script directs employees to downplay those fees by stating that "all of the saving and the

payments we discussed already have all of the fees for our services included and there are no additional costs whatsoever."

DISPUTED: The script does not "direct" employees to "downplay" the monthly maintenance fees. (Krause Ex. D) As plaintiff acknowledges in this UF 157, SLP's script *does* tell the SLP call handler to separate the SLP monthly fee from the loan repayment amount. Moreover, the distinction is clear from the various components of the SLP Service Agreement. (Krause @ 15 and Ex D; Gill @ 16)

**UF 158**: Moreover, the enrollment script directs employees to separately disclose SLP's monthly maintenance fee only after asking the consumer to pay the upfront enrollment fee (and processing that payment if the consumer was ready to make payment).

DISPUTED: The cited evidence does not support this statement. The script directs the SLP employee to collect payment information, but not to process a payment. (Krause Ex. D) SLP collects payment *information* before the client actually enrolls because it is part of the Service Agreement, which provides authorization for SLP to collect the enrollment fee; the enrollment fee is never actually *collected* by SLP until the client has reviewed the Service Agreement and its component parts with SLP, and has provided SLP with the signed agreement. (Krause @ 15-16; Gill @ 9)

**UFs 159-161**: [Scripts do not say the monthly fee is for the life of the loan, the amount of the monthly payment going to the loan, or to whom the fees are being paid]

DISPUTED: The script includes a review of the Service Agreement and its various components, including reading various parts verbatim (Krause, Ex. C), and those components disclose this information. (Krause Ex. D)

**UF 162**: During the call, the enrollment script directs employees to send the consumer a copy of SLP's Service Agreement, but the script instructs employees to send the agreement only after attempting to collect payment of the enrollment fee.

DISPUTED: The script directs the SLP employee to collect payment information, but not to process a payment. (Krause Ex. D) SLP collects payment *information* before the client actually enrolls because it is part of the Service Agreement, which provides authorization for SLP to collect the enrollment fee; the enrollment fee is never actually *collected* by SLP until the client has reviewed the Service Agreement and its component parts with SLP, and has provided SLP with the signed agreement. (Krause @ 15-16; Gill @ 9)

**UF 163**: At least one version of the Service Agreement presented the monthly maintenance fee and the loan payment as a combined "Estimated New Program Monthly Cost."

DISPUTED: In several places among the components of SLP's Service Agreement (SJ Ex 22), including under where it shows the composite monthly number, the Service Agreement also separates out the amount of the Monthly SLP fee and the DOE loan payment amount.

**UF 164**: Defendants' statements misled at least some consumers about the price of Defendants' student loan debt relief services.

DISPUTED: *Objection—SJ 40 contains hearsay as to the appended complaints.* As plaintiff acknowledges in this UF 157, SLP's script *does* tell the SLP call handler to separate the SLP monthly fee from the loan repayment amount. Moreover, the distinction is clear from the various components of the SLP Service Agreement. (Krause @ 15 and Ex D; Gill @ 16)

**UF 165**: At least some consumers were expressly told that there were no fees other than the enrollment fee.

DISPUTED: As plaintiff acknowledges in this UF 157, SLP's script *does* tell the SLP call handler to separate the SLP monthly fee from the loan repayment amount. Moreover, the distinction is clear from the various components of the SLP Service Agreement, which are also covered in the enrollment call. (Krause @ 15 and Ex D; Gill @ 16) The Gomez declaration is not credible. (Gill @ 16 "Gomez Declaration")

**UF 166**: Consumers who did not know about the recurring monthly fee at the time of enrollment have indicated that they only later realized that they were being charged a monthly fee when reviewing their credit card or bank statement and noticing a recurring $39 auto-debit, in addition to (and separate from) their Federal student loan payment.

DISPUTED: As plaintiff acknowledges in this UF 157, SLP's script *does* tell the SLP call handler to separate the SLP monthly fee from the loan repayment amount. Moreover, the distinction is clear from the various components of the SLP Service Agreement, which are also covered in the enrollment call. (Krause @ 15 and Ex D; Gill @ 16) The Gomez declaration is not credible. (Gill @ 16 "Gomez Declaration")

**UF 179**: As of September 22, 2015, the FTC Consumer Sentinel Database had approximately 88 complaints from consumers about Student Loan Processing.US, including complaints from consumers who indicated that Student Loan Processing.US had, at some point, misrepresented itself to be part of or affiliated with the Federal government, and who indicated that they were deceived regarding the monthly maintenance fee charged by Student Loan Processing.US.

DISPUTED: *Objection—SJ 40 contains hearsay as to the appended complaints.* As plaintiff acknowledges in this UF 157, SLP's script *does* tell the SLP call handler to separate the SLP monthly fee from the loan repayment amount. Moreover, the distinction is clear from the various components of the SLP Service Agreement. (Krause @ 15 and Ex D; Gill @

16) In addition, none of the complainants points to any specific language or logo in any SLP materials as a basis for believing SLP is in fact affiliated with the government generally or DOE specifically. (Krause @ 37; Gill @ 12).

Dated: January 4, 2016

JEFFREY C. BRIGGS
BRIGGS LAW OFFICE

By:________/S/____________________
Jeffrey C. Briggs
Attorneys for Defendants Irvine WebWorks, Inc., dba Student Loan Processing.US, and James Krause