DAVID RUBENSTEIN, DC Bar #458770
*Deputy Enforcement Director*
FRANK KULBASKI, DC Bar #438917
*Assistant Deputy Enforcement Director*
RINA TUCKER HARRIS, DC Bar #444550 (*Pro Hac Vice*)
(Email: RinaTucker.Harris@cfpb.gov; Phone: 202-435-9196)
NICHOLAS JABBOUR, DC Bar #500626 (*Pro Hac Vice*)
(Email: Nicholas.Jabbour@cfpb.gov; Phone: 202-435-7508)
BRANDIS C. ANDERSON, CA Bar #261325
(Email: Brandis.Anderson@cfpb.gov; Phone: 202-435-7548)
*Enforcement Attorneys*
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
Fax: 202-435-7722

KENT KAWAKAMI, CA Bar #149803 – Local Counsel
(Email: Kent.Kawakami@usdoj.gov; Phone: 213-894-4858)
United States Attorney's Office
Central District of California – Civil Division
300 North Los Angeles Street, Room 7516
Los Angeles, CA 90012
Fax: 213-894-2380

Attorneys for Plaintiff Consumer Financial Protection Bureau

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION**

| | |
|---|---|
| Consumer Financial Protection Bureau,<br><br>Plaintiff,<br><br>v.<br><br>IrvineWebWorks, Inc. d/b/a Student Loan Processing.US; *et al.*,<br><br>Defendants. | Case No. SACV14-1967-JVS (DFMx)<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**<br><br>**HON. JAMES V. SELNA**<br><br>**Date: January 25, 2016**<br>**Time: 1:30 PM**<br>**Place: Courtroom 10C (Santa Ana)** |

# TABLE OF CONTENTS

INTRODUCTION ........ 1

ARGUMENT ........ 1

I. There Is No Genuine Dispute About Key Facts In The Bureau's Statement Of Undisputed Facts ........ 1

II. Because Defendants' Service "Is Getting Them Into A Better [Repayment] Plan," Defendants Represent to Offer A "Debt Relief Service" Under The TSR ........ 4

III. The Bureau Is Entitled To Summary Judgment On Its Deception Claims ........ 7

A. The CFPA Prohibits Unfair, Deceptive, *Or* Abusive Practices; It Does Not Require That Prohibited Conduct Be Unfair, Deceptive, *And* Abusive ........ 7

B. The Bureau Is Entitled To Summary Judgment On Its TSR And CFPA Deception Claims Related To Government Affiliation ........ 8

C. The Bureau Is Entitled To Summary Judgment On Its TSR And CFPA Deception Claims Concerning The Monthly Maintenance Fee ........ 10

IV. The Six Consumer Declarations Submitted By The Bureau Are Reliable ........ 12

V. The Relief Sought By The Bureau Is Appropriate And Warranted ........ 16

VI. Defendants' Objections To The Bureau's Evidence Are Unfounded ........ 18

CONCLUSION ........ 21

# TABLE OF AUTHORITIES

## Cases

*Campbell v. United States*,
365 U.S. 85 (1961) ....................18

*FTC v. Cyberspace.com LLC*,
453 F.3d 1196 (9th Cir. 2006) ....................9

*FTC v. E.M.A. Nationwide, Inc.*,
767 F.3d 611 (6th Cir. 2014) ....................13

*FTC v. Ewing*,
2014 WL 5489210 (D. Nev. Oct. 29, 2014) ....................20

*FTC v. Federal Loan Modification Law Center, LLP*,
No. 09-00401-CJC(MLGx) (C.D. Cal. Nov. 17, 2010) ....................9

*FTC v. Figgie Int'l, Inc.*,,
994 F.2d 595 (9th Cir. 1993) (per curiam) ....................9, 17, 19

*FTC v. Gill*,
71 F. Supp. 2d 1030 (C.D. Cal. 1999), *aff'd*, 265 F.3d 944 (9th Cir. 2001) ....................9, 13

*FTC v. Think Achievement Corp.*,
144 F. Supp. 2d 993 (N.D. Ind. 2000) ....................9

*Interstellar Starships Services, Ltd, v. Epix, Inc.*,
184 F.3d 1107 (9th Cir. 1999) ....................8

*Loughrin v. United States*,
134 S.Ct. 2384 (2014) ....................7

*Resort Car Rental Sys., Inc. v. FTC*,
518 F.2d 962 (9th Cir. 1975) ....................13

*Strom v. Nat'l Enterprise Systems, Inc.*,
2010 WL 1533383, at *4 (W.D.N.Y. Apr. 15, 2010) ....................20

## Statutes

12 U.S.C. § 5531 ....................7, 8, 16

12 U.S.C. § 5536 .......... 7, 8

12 U.S.C. § 5565 .......... 17, 18

**Regulatory Materials**

16 C.F.R. § 310.2 (2010) .......... 7

16 C.F.R. § 310.3 (2010) .......... 10, 11

75 Fed. Reg. 48458 (2010) .......... 6

**Other Authorities**

Fed. R. Civ. P. 56 .......... 2

Fed. R. Evid. 803 .......... 20

Fed. R. Evid. 807 .......... 19

FTC, "Complying with the Telemarketing Sales Rule," *available at*: https://www.ftc.gov/tips-advice/business-center/guidance /complying- telemarketing-sales-rule (last accessed Jan. 11, 2016) .......... 11

Plaintiff Consumer Financial Protection Bureau ("Bureau") respectfully submits this reply to the Opposition to Plaintiff's Motion for Summary Judgment, Dkt. No. 40, filed by Defendants IrvineWebWorks, Inc. d/b/a Student Loan Processing.US ("Student Loan Processing.US" or "Company") and James Krause ("Def. Opp'n" or "Defendants' Opposition").

## INTRODUCTION

Defendants' Opposition mischaracterizes the legal standard by which to evaluate the Bureau's claims, provides extraneous (and unsupported) "facts" that are irrelevant to this matter, and makes sweeping allegations – based purely on inadmissible hearsay and unfounded speculation – about consumer victims, the U.S. Department of Education ("ED"), student loan servicers, and the Bureau. What Defendants fail to do in their Opposition, however, is genuinely dispute the material facts on which the Bureau's Motion for Summary Judgment rests.

The Bureau has established that there are no triable issues in this matter. The undisputed facts demonstrate that Defendants violated the Telemarketing Sales Rule ("TSR") by charging upfront fees for advertised debt relief services, misrepresenting an affiliation with ED, and failing to disclose and misrepresenting the cost of their services. In addition, the undisputed facts demonstrate that Defendants' deceptive conduct violated the Consumer Financial Protection Act ("CFPA"). Nothing in Defendants' Opposition changes the fact that summary judgment is appropriate for all counts in the Bureau's Complaint. As a result, the Court should grant the Bureau's Motion for Summary Judgment in its entirety, and order the relief requested by the Bureau as set forth in the Proposed Judgment filed with the Court on December 28, 2015.

## ARGUMENT

### I. There Is No Genuine Dispute About Key Facts In The Bureau's Statement Of Undisputed Facts

In their Opposition, Defendants go to great lengths to suggest the existence of

disputed facts that must be tried by a jury. *See* Def. Opp'n at 12-18. However, despite Defendants' best efforts to obfuscate the factual record in this matter, the facts in this case are straightforward and undisputed.

The Bureau, in its Statement of Uncontroverted Facts and Conclusions of Law, Dkt. No. 35 ("Bureau's Statement" or "Pl. UF"), sets forth 190 paragraphs of material facts and evidentiary citations submitted to this Court in support of the Bureau's Motion for Summary Judgment. Notably Defendants concede, as they must and without contention, that there are no genuine disputes necessary to be litigated for 163 of the 190 paragraphs in the Bureau's Statement. The remaining 27 alleged "disputes" are a hodgepodge of misstatements of the record, quibbles over wording, and baseless attacks against consumer victims and the Federal government.[1] Moreover, many of the alleged disputes rest solely on unfounded and unsupported allegations by James Krause and Thomas Gill, the President and Regional Director of Student Loan Processing.US, respectively, neither of which cite to any factual evidence in support of many of their bald allegations.[2] Since the evidence offered by Defendants does not establish a genuine dispute with any of the facts submitted by the Bureau, the facts submitted in the Bureau's Statement remain undisputed for purposes of the Bureau's Motion (Fed. R. Civ. P. 56(c)(1)(B) and 56(e)(2)) and include the following:

- Student Loan Processing.US purports to perform a variety of student loan debt

---

[1]The Bureau has filed a Response to Defendants' Statement of Genuine Disputes simultaneously with this memorandum.

[2] For example, Mr. Krause, in his declaration, contends that it takes an unassisted consumer "certainly well more than 30 minutes" to complete application forms for ED programs, even though the Bureau obtained the 30-minute estimate from the forms themselves (Pl. UF ¶ 21). Mr. Krause, however, does not cite to any evidence in support of this contention, and certainly cannot know how long it takes every "unassisted consumer" to complete the required ED forms. *See* Declaration of James Krause in Opposition to Plaintiff's Motion for Summary Judgment, Dkt. No. 40-1 ("Def. Opp'n, Krause Decl."), ¶ 8.

relief services for its customers. Pl. UF ¶ 26.

- The services offered by Student Loan Processing.US purportedly include "improving Client's Federal Student Loan repayment terms," "analyz[ing] Client's Federal Student Loan debt situation," "research[ing] potential debt restructuring options that may be available to Client," and helping consumers identify and apply for the various ED repayment plans for which the consumer might qualify, including repayment plans that help the consumer achieve lower payments and possible loan forgiveness for his/her Federal student loans. Pl. UF ¶¶ 27, 29, 47, 61-62, 67, 84-85, 88.
- Defendants' student loan debt relief services are the same regardless of whether the consumer needs to first combine his/her eligible Federal student loans into a Direct Consolidation Loan. Pl. UF ¶ 29.
- Defendants' direct mailer – which was the primary advertising method used to solicit consumers – includes on the exterior of the mailer (a) the words "Official Business" in bold font, (b) a statement that "any person who interferes with or obstructs delivery of this letter or otherwise violates 18 United States Code 1702 et seq." could be subject to a fine or imprisonment, (c) a bald-eagle stamp, and (d) the logo of Student Loan Processing.US (which Defendants changed in September 2012 after receiving a cease and desist letter from ED regarding similarities between the logo and ED's seal), as well as statements inside the mailer that Student Loan Processing.US is a "consultation service" that "work[s] with the Department of Education" without any disclaimer that Defendants have no affiliation with ED. Pl. UF ¶¶ 41, 125, 127, 134-35.
- Consumers who contact Student Loan Processing.US generally do so because they are interested in student loan debt relief services, including enrolling in programs that result in a lower monthly payment amount or loan forgiveness for their Federal student loans. Pl. UF ¶¶ 92, 94-95.

- Student Loan Processing.US charges an enrollment fee for its services, and requires full payment of the enrollment fee before any services are performed. Pl. UF ¶¶ 30-31, 113. All consumers must pay the full upfront enrollment fee regardless of the services that Student Loan Processing.US performs on the consumer's behalf. Pl. UF ¶ 114. During the enrollment call, the employee of Student Loan Processing.US gathers banking information from the consumer for payment of the enrollment fee. Pl. UF ¶¶ 109-111.
- Student Loan Processing.US also charges consumers a monthly maintenance fee of $39-54 per month. Pl. UF ¶¶ 33-35. Defendants' enrollment scripts direct employees to include this fee in the new monthly payment amount the consumer would be expected to pay towards his/her student loans if he/she enrolled with Student Loan Processing.US. Pl. UF ¶ 153. The scripts also direct employees not to disclose this fee until after the consumer's banking information has been collected. Pl. UF ¶ 158.
- Consumers have complained about Student Loan Processing.US to various third parties, including the Bureau and the State Attorneys General. Those complaints indicate that Student Loan Processing.US misrepresents itself to be part of or affiliated with the Federal Government, and that the Company deceives consumers regarding its monthly maintenance fee. Pl. UF ¶¶ 178-181.

## II. <u>Because Defendants' Service "Is Getting Them Into A Better [Repayment] Plan," Defendants Represent to Offer A "Debt Relief Service" Under The TSR</u>

To oppose the Bureau's Motion for Summary Judgment on Count I of the Complaint, Defendants recycle the same arguments that they made in their Motion for Partial Summary Judgment. To summarize: (1) Defendants claim that they help consumers "secure a substantial reduction in their monthly payment obligation or overall payoff amount after forgiveness," but allege that this is not a debt relief

service because Defendants also perform loan consolidation for some customers (Def. Opp'n at 10-11), and (2) the FTC only sought to regulate certain types of entities where consumers were vulnerable to paying high advance and ongoing fees and not receiving promised benefits, and purportedly Defendants are distinct from those types of entities (Def. Opp'n at 11-12). These arguments misconstrue the TSR and mischaracterize the nature of Defendants' services.

Defendants' initial claim – that because they provide loan consolidation for some customers, they should be exempt from the TSR – demonstrates a misunderstanding of the TSR. As the Bureau demonstrated in its Opposition to the Defendants' Motion for Partial Summary Judgment (Pl. Opp'n), the evil that the FTC was addressing in the 2010 TSR amendments is the ongoing relationship that debt relief service providers claim to offer, in exchange for substantial upfront and ongoing fees. Pl. Opp'n at 4-6. A pure refinance – in which there is no ongoing relationship, but a single transaction – does not present this problem. *Id.* at 6. The FTC was not intending to create some loophole through which all debt relief companies can evade the TSR simply by purporting to offer refinancing as part of their bundle of services; that loophole would be so great that it would eviscerate the 2010 amendments. The FTC was carving out only a narrow category of companies – those that only offer refinancing and no ongoing debt relief. *Id.* It would be perverse if a company like Student Loan Processing. US – whose advertising is almost exclusively focused on debt relief and which justifies its ongoing monthly fees based on purportedly providing its customers with continuous debt relief assistance (*see id.* at 7) – were able to evade the TSR simply because it offers consolidation.

Defendants bury a problematic fact for their specious argument: that they do not offer consolidation to all of their customers because some have already consolidated their loans. Defendants try to minimize this inconvenient fact by claiming that it happened in *very few* instances (Def. Opp'n at 11 (emphasis in original)), even though Defendants admit that they actually do not know the number

of customers for whom they did not perform consolidation (Def. Opp'n, Krause Decl. ¶ 25). But regardless of the number of times it happened, the reason this fact is significant is that it demonstrates that Defendants are a debt relief service, not a consolidation service. Consolidation may be a means by which some consumers are able to enroll in debt relief programs, but consolidation is not the service being offered or advertised, nor is consolidation the service for which the Company is charging fees. Rather, as Mr. Krause stated in the Company's 30(b)(6) deposition, "***the service is getting them into a better [repayment] plan than they are already in***." Pl. SJ Ex. 37 (SLP 30(b)(6) Dep.) at 494 (emphasis added). Thus, it makes sense that all customers are charged the same upfront and monthly fees, even when no consolidation occurs. *Id.* Consumers are paying to get into "a better [repayment] plan" – i.e., a debt relief service.

Defendants' assertion that the FTC was only concerned about providers of debt management plans, debt settlement services, and debt negotiation services is also based on a misreading of the Federal Register entry. The FTC made clear that it was not limiting the amendments to these three categories, but was seeking to broadly cover "all current and reasonably foreseeable forms of debt relief services" and to "ensur[e] that consumers are protected regardless of how a debt relief service is structured or denominated." 75 Fed. Reg. 48,458, 48,467 (2010). As the Bureau catalogued in its opposition to the Defendants' motion for partial summary judgment, the Defendants share many characteristics with the debt relief companies described by the FTC, including misleading consumers about fees, using high-pressure tactics to lock consumers into problematic agreements, misleading consumers about the company's relationship with the government, and making promises to the consumers about the terms of debt relief that are achievable then sometimes failing to deliver on those promises. Pl. Opp'n at 12-14.

Defendants "represent[] . . . to renegotiate, settle, or in any way alter the terms of payment" for consumers' student loans, and therefore fall within the definition of

"debt relief service" set forth in the TSR. 16 C.F.R. § 310.2(m) (2010). The Court should grant summary judgment in favor of the Bureau with respect to Count I of the complaint.

## III. The Bureau Is Entitled To Summary Judgment On Its Deception Claims

### A. The CFPA Prohibits Unfair, Deceptive, *Or* Abusive Practices; It Does Not Require That Prohibited Conduct Be Unfair, Deceptive, *And* Abusive

As an initial matter, under the CFPA, an act or practice is not required to be unfair, deceptive, *and* abusive. However, Defendants' Opposition cites to the legal standards for "unfair" and "abusive" conduct, despite the fact that the Bureau has only alleged that the Defendants engaged in "deceptive" conduct. *See* Def. Opp'n at 17. To the extent that Defendants are asserting that conduct must meet all three standards to be illegal under the CFPA, Defendants are incorrect.

The CFPA prohibits acts or practices that are unfair, deceptive, *or* abusive. This is apparent from the plain language of the CFPA: "It shall be unlawful for any covered person . . . to engage in any unfair, deceptive, *or* abusive act or practice." 12 U.S.C. § 5536(a)(1)(B) (emphasis added); *see also* 12 U.S.C. § 5531(a) ("The Bureau may take any action authorized under part E [which allows the Bureau to bring lawsuits] to prevent a covered person or service provider from committing or engaging in an unfair, deceptive, *or* abusive act or practice.") (emphasis added). Common principles of statutory interpretation dictate that the terms "unfair," "deceptive," and "abusive" should not be conflated. *See, e.g.*, *Loughrin v. United States*, 134 S.Ct. 2384, 2390 (2014) ("As we have recognized, [the] ordinary use [of the term 'or'] is almost always disjunctive, that is, the words it connects are to be given separate meanings.") (quotation omitted). Indeed, there would be no need for the statute to define the authority of the Bureau with respect to "unfair" practices, and to separately define the authority of the Bureau with respect to "abusive" practices, if those terms meant the same thing. *See* 12 U.S.C. §§ 5531(c), (d). Rather, as the

CFPA plainly provides, the Bureau's authority extends to preventing acts that are either "unfair, deceptive, *or* abusive." 12 U.S.C. §§ 5531(a), 5536(a)(1)(B) (emphasis added).

As the Bureau indicated in its motion, an act or practice is "deceptive" under the CFPA if: (1) it is likely to mislead the consumer; (2) the consumer's interpretation of the act or practice is reasonable under the circumstances; and (3) the misleading act or practice is material. Pl. Mot. at 21 (citing authorities).

**B. The Bureau Is Entitled To Summary Judgment On Its TSR And CFPA Deception Claims Related To Government Affiliation**

Since Defendants have no legitimate basis in fact or in law to challenge the Bureau's claims that they violated the TSR and the CFPA by improperly representing an affiliation with ED, Defendants resort to baseless attacks on the credibility of consumer victims (discussed in greater detail in Section IV below) and unwarranted contentions of nefarious conduct by the Federal government in an effort to divert the Court's attention from the legal standard applicable in this case. Def. Opp'n at 13-14. The Court should ignore these diversions.

Though there is no dispute that Defendants' direct mailer uses the words "Official Business," cites to the "United States Code," uses a bald eagle stamp, and uses a logo that even ED concluded was strikingly similar to ED's seal (Pl. UF ¶¶ 125, 134), and though is it is also undisputed that Defendants made express misstatements that they "work with" ED (Pl. UF ¶¶ 23,127, 130), Defendants reach the illogical conclusion that this case is so "intensely factual," as to render summary judgment "disfavored." Def. Opp'n at 13. However, as demonstrated by the absence of any genuine disputes of material fact, Defendants' contention is simply untrue. Moreover, contrary to Defendants' erroneous reliance on a legal standard unique to trademark disputes (*see Interstellar Starships Services, Ltd, v. Epix, Inc.*, 184 F.3d 1107, 1109 (9th Cir. 1999) ("Because of the intensely factual nature of trademark disputes, summary judgment is generally disfavored in the trademark arena")), the

Ninth Circuit and this Court have repeatedly decided deception cases on summary judgment. *See FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006); *FTC v. Gill*, 71 F. Supp. 2d 1030, 1044 (C.D. Cal. 1999), *aff'd*, 265 F.3d 944 (9th Cir. 2001); *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 609 (9th Cir. 1993) (per curiam); *FTC v. Federal Loan Modification Law Center*, LLP, No. 09-00401-CJC(MLGx) (C.D. Cal. Nov. 17, 2010).

Defendants' attempt to distinguish the cases that the Bureau cited in its opening brief does not withstand scrutiny. Defendants indicate that *FTC v. Think Achievement Corp*., 144 F. Supp. 2d 993 (N.D. Ind. 2000), involved postal jobs, which are a "uniquely governmental function" (Def. Opp'n at 13); so too in this case, Federal student loans are a uniquely governmental function, and indeed Defendants' advertisements and scripts make abundant references to ED and new Federal benefits. Similarly, Defendants purport to distinguish *FTC v. Federal Loan Modification Law Center*, LLP, No. 09-00401-CJC(MLGx) (C.D. Cal. Nov. 17, 2010), on the ground that the use of the word "federal" in the company's name, in the "context of vulnerable homeowners, . . . carried the summary judgment day" (Def. Opp'n at 13); so too in this case, Defendants purported to "work with" ED, used a logo and imagery associated with the Federal Government, and preyed upon vulnerable consumers with tens of thousands of dollars in student loan debt. Just as in *Think Achievement* and *Federal Loan Modification Law Center*, summary judgment is warranted here.

While Defendants summarily argue that no customer confusion can be said to have been "reasonable" or "material" as a matter of law since the enrollment process "certainly should have dispelled it" (Def. Opp'n at 14), Defendants do not offer any evidence in support of this conclusion other than self-serving assertions that the distinction between ED and Student Loan Processing.US is made "very clear" in the Service Agreement and enrollment scripts. Def. Opp'n at 14. However, neither the Service Agreement nor the enrollment scripts contain any language disclaiming an

affiliation with ED. Pl. SJ. Ex. 11 (Inbound Call Script No. 1); Pl. SJ Ex. 22 (Prior Svs. Agmt.). In fact, only Defendants' website contains a non-prominent disclaimer that Student Loan Processing.US is not affiliated, endorsed, or sponsored by ED, and even that disclaimer was added only in September 2012 following receipt of a cease and desist letter from ED. Pl. UF ¶¶ 133, 138. Lastly, Defendants cannot reasonably dispute that consumers were misled by Defendants' misrepresentations, nor can they dispute that consumers complained to Defendants alleging that Student Loan Processing.US had, at some point, misrepresented itself to be part of or affiliated with the Federal Government, including ED. Pl. UF¶¶ 122, 178, 179.

In sum, in the course of advertising and marketing student loan debt relief services, Defendants made representations directly or by implication, that created the net impression that Defendants were affiliated with ED, in violation of the TSR and the CFPA. Defendants have offered no evidence, nor any valid legal objection, to rebut the Bureau's claims. Accordingly, summary judgment is warranted in favor of the Bureau with respect to counts II and IV of the Complaint

### C. <u>The Bureau Is Entitled To Summary Judgment On Its TSR And CFPA Deception Claims Concerning The Monthly Maintenance Fee</u>

Defendants' defense of their disclosures regarding the monthly maintenance fee avoids the relevant legal standards set forth in the Complaint and discussed in the Bureau's motion. It is not sufficient for Defendants to simply isolate language from the enrollment script and Service Agreement where the $39 fee is mentioned, and to self-servingly claim that this language is not misleading. *See* Def. Opp'n at 15-16. Rather the legal issues are: (1) under the TSR, have Defendants failed to disclose truthfully, before the customer provides banking information, the total cost of Defendants' services, and mispresented, directly or by implication, the total cost of Defendants' services (16 C.F.R. §§ 310.3(a)(1)(i), (a)(2)(i) (2010)); and (2) under the CFPA, are Defendants' statements regarding the monthly fee material and likely to mislead reasonable consumers? These questions can both be answered "yes" without

resort to any of the Defendants' alleged disputed facts.

Under the TSR, it is evident that the Defendants do not disclose the total cost of their services before a consumer provides financial account information. The FTC has indicated that consumers must be provided with the total cost of the services before the seller or telemarketer requests "consent to pay" from the consumer – i.e., before the seller or telemarketer "ask[s] for any credit card, bank account, or other information that they will or could use to obtain payment.[3] In this case, the Defendants collect the consumer's bank account information *before the $39 monthly maintenance fee is ever mentioned*. Pl. UF ¶ 158. Thus, a consumer is not aware of the $39 fee, much less how many years he/she will have to pay that fee, at the time that he/she provides "consent to pay," thereby constituting a violation of the TSR. 16 C.F.R. § 310.3(a)(1)(i) (2010).

Even after the consumer provides "consent to pay," the Defendants still misrepresent the total cost of their services. Neither the script nor the Service Agreement indicates that because the $39 fee is charged by Student Loan Processing.US, the consumer may have two monthly debits: (1) a monthly loan payment debited by his/her servicer, and (2) a $39 debit from Student Loan Processing.US. Nor is the consumer made aware of the number of years for which he/she will have to pay the $39 fee. Accordingly, Defendants misrepresent, directly or by implication, the total cost of their services, which constitutes a further violation of the TSR. 16 C.F.R. § 310.3(a)(2)(i) (2010).

Finally, Defendants' conduct is likely to mislead reasonable consumers, in violation of the CFPA. Defendants do not (and cannot) dispute that neither the enrollment script nor the Service Agreement informs the consumer that the monthly fee of $39 is not charged by the Federal Government or the consumer's loan servicer,

[3] FTC, "Complying with the Telemarketing Sales Rule," *available at*: https://www.ftc.gov/tips-advice/business-center/guidance/complying-telemarketing-sales-rule (last accessed Jan. 11, 2016).

and instead is kept by Student Loan Processing.US., and that for this reason, the $39 will be debited separately from the consumer's monthly payment to his/her servicer. It is highly deceptive to lump the $39 fee together with the monthly loan payment, without specifying that the two amounts will not actually be paid together. As the Bureau has documented, consumers were confused when they saw a $39 debit that was separate from their monthly loan payment; they did not understand that there would be a separate charge by Student Loan Processing.US because the $39 had not been described to them in that manner. Pl. UF ¶ 166 (citing consumer declarations). By presenting information about the monthly maintenance fee in a manner likely to confuse a reasonable consumer, Defendants have violated the CFPA.

In sum, Defendants' invocations of their disclosures regarding the monthly maintenance fee miss the mark: there is no dispute that the Defendants did not disclose the total cost of their services before collecting banking information from the consumer, nor is there sufficient evidence to dispute that the Defendants' confusing presentation of the monthly maintenance fee misled consumers into believing that the fee would be part of their monthly loan payment. Accordingly, summary judgment is warranted in favor of the Bureau with respect to counts III and V of the Complaint.

## IV. <u>The Six Consumer Declarations Submitted By The Bureau Are Reliable</u>

Though the Bureau need not show actual consumer deception to prevail on any of its claims, the Bureau, with its Motion for Summary Judgment, submitted declarations from six consumers to provide the Court with first-hand accounts of consumers' experiences with Student Loan Processing.US. Defendants, through a declaration submitted by Mr. Gill, claim that there are "discrepancies between the declarants and our client file information" (Def. Opp'n, Gill Decl. ¶ 16), but the discrepancies are, in fact, manufactured by Mr. Gill.

First, it is important to note that Mr. Gill only reviewed enrollment calls for two of the six consumers (Mr. Chang and Ms. Kletzka). He indicates that he reviewed recordings for a third consumer (Ms. Bethea), but the only recording he

reviewed for Ms. Bethea is the recording of the call where she attempted to cancel her enrollment. There apparently are no enrollment call recordings available for Ms. Bethea or for the remaining three consumers.

Second, for all six of the consumers, Mr. Gill acts as though the Service Agreement is some sort of cure-all that remedies any problematic statements by Company representatives on the phone, particularly concerning the monthly maintenance fee. Put differently, it is Mr. Gill's apparent view that his Company can misrepresent or fail to disclose key information during the enrollment call, and then rely on the Service Agreement to present correct information. That is not the law. *See, e.g.*, *Resort Car Rental Sys., Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir. 1975) (indicating that the law "is violated if [defendant] induces the first contact through deception, even if the buyer later becomes fully informed before entering the contract"); *Gill*, 71 F. Supp. 2d at 1044 (granting summary judgment for FTC despite disclaimers in contracts with consumers because such disclaimers were insufficient to overcome misrepresentations made to consumers); *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 634 (6th Cir. 2014) (affirming the district court's decision granting the FTC's motion for summary judgment where telemarketers made deceptive representations regarding the fees that consumers would be charged, and declining to hold that this deception was cured by the contracts signed by consumers).

Even when employees read the first three paragraphs of the service agreement over the phone, it is important to note that those three paragraphs do not indicate that the monthly maintenance fee will be debited by Student Loan Processing.US separately from the consumer's loan payment, and that the fee is kept by Student Loan Processing.US and is not passed through as a payment toward the consumer's loans. Pl. SJ Ex. 21 (Current Svs. Agmt.) at 297; Pl. SJ Ex. 22 (Prior Svs. Agmt.) at 302. And in the first version of the Service Agreement, which appears to have been the operative version for all six declarants, the amount of the monthly fee is not even disclosed in the three paragraphs read over the phone. Pl. SJ Ex. 22 (Prior Svs.

Agmt.) at 302. Moreover, the Service Agreement has never disclosed that Student Loan Processing.US has no affiliation with ED.

With respect to specific declarants, the Bureau notes as follows:

Mr. Chang: During his enrollment call, Mr. Chang indicated that he worked for the Department of Education (he later clarified that it was for the Hawaii agency, not the Federal agency). Upon indicating this, the representative remarked, "Bringing it all back in house, then." SJ Ex. 55 (Chang 8/7/13 recording) at 9:35. The representative also stated that the Company is "required to collect" the Enrollment Fee. *Id.* at 38:27. The representative offered that Mr. Chang could "take a minute" to review the Service Agreement before signing it. *Id.* at 1:00:36. The representative never mentioned the amount of any monthly maintenance fee, nor that it would be debited separately from the loan payment and kept by the Company. Apart from reading paragraph 3 of the Service Agreement, there was no mention of the monthly maintenance fee. The representative also never indicated that the Company has no affiliation was ED.

When Mr. Chang called to discontinue his enrollment, he indicated that he felt that the Company represented itself as his loan servicer. SJ Ex. 56 (Chang 3/27/14 recording) at 1:30. He also indicated that any monthly maintenance fee had been obscured because it was quoted "part of [his] loan payment." *Id.* at 4:41. He expressed his belief that the Company was "not upfront" and that it was "a scam." *Id.* at 1:49, 2:19.

Ms. Kletzka: During Ms. Kletzka's enrollment call, a representative of Student Loan Processing.US indicated that the Enrollment Fee is "require[d]" in order to apply for the benefits with the Department of Education, and that the fee is "due to the federal documentation that we have to work with the Department of Education on" (SJ Ex. 57 (Kletzka 8/3/13 recording) at 6:50), all of which are false statements. Ms. Kletzka was not at a computer during the call, and thus the representative indicated that she would need to call back when she was at a computer before the

Service Agreement would be sent, but the representative indicated on two occasions that he would need a mere "two minutes" of her time to review the Service Agreement with her and for her to sign. SJ Ex. 58 (Kletzka 8/5/13 recording) at 29:29, 30:20. The representative never mentioned the amount of any monthly maintenance fee, nor that it would be debited separately from the loan payment and kept by the Company. Apart from reading paragraph 3 of the Service Agreement, there was no mention of the monthly maintenance fee. The representative never indicated that the Company has no affiliation was ED.

At a later date, when Ms. Kletzka was debited $39 to pay the monthly fee, she was confused and called the Company. She told a Company representative, "It comes through separately? . . . . I just didn't know that they were doing that and I didn't realize that. . . . [Y]ou do that to everybody? . . . . That's a lot of money." SJ Ex. 59 (Kletzka 12/31/13 recording) at 1:05. Ms. Kletzka subsequently attempted to cancel her enrollment, explaining to the representative, "I could have called the government myself which I didn't realize because I thought you were the government. . . . Nobody informed me of [the $39 fee] . . . and I called and I said what is this $39? I had no idea I was going to be charged a monthly fee." SJ Ex. 60 (Kletzka 1/20/15 recording) at 3:30, 6:05. Her anger at the deception was evident: "I don't want you guys touching anything that I do anymore ever . . . . I feel that this was misrepresented. . . . I am livid." *Id.* at 8:48.

<u>Ms. Bethea</u>: As noted above, the only recording for Ms. Bethea that is apparently available is a call in which she attempts to cancel her enrollment. As she indicates, she had believed that Student Loan Processing.US was her government-contracted servicer: "I just got off the phone with the Department of Education and they have no idea why you guys are charging me this $39 because it is not being applied to my loan and you are no longer managing my loan." SJ Ex. 61 (Bethea 4/30/14 recording) at 1:38. She explains: "I was misled. I thought this $39 was going toward my loan and not toward services that I basically do myself." *Id.* at 7:25. The

representative confirms that many consumers are confused about the role of Student Loan Processing.US: "A lot of our clients [] misunderstand" the Company's role and wrongly believe that the Company "service[s] the loans." *Id.* at 7:49. He also tells Ms. Bethea that, if she stops paying the monthly fee, "yes . . . it is possible" that it will affect her credit. *Id.* at 8:27.

Remaining three declarants: Mr. Gill does not point to anything that refutes these witnesses' statements. Rather, he just makes guesses as to what the consumers stated to Student Loan Processing.US representatives and based on those guesses, accuses the witnesses of having made misrepresentations. Mr. Gill's accusations should not be credited, and as noted above, he cannot simply invoke the Service Agreement as some sort of panacea to all Company misrepresentations. Notably, Mr. Gill continues to claim that his Company "works with" ED (Def. Opp'n, Gill Decl. at 14), even though that is absolutely false.

Simply put, the six declarants are credible. Their declarations (and the phone recordings, where available) confirm misrepresentations, either direct or implicit, by Student Loan Processing.US concerning its affiliation with ED and its fees. As the declarations demonstrate, consumers are in fact misled by Student Loan Processing.US and, once they become aware that they were misled, they want nothing more to do with the Company.

## V. The Relief Sought By The Bureau Is Appropriate And Warranted

Defendants argue that the Bureau is not entitled to the remedies it seeks in the Complaint, including restitution, because the Bureau has failed to consider purported "countervailing benefits to consumers." *See* Def. Opp'n at 18. However, the standard of "countervailing benefits to consumers" only applies where the Bureau alleges that an act or practice is unfair, not in a case where the Bureau alleges that an act or practice is deceptive. *See* 12 U.S.C. § 5531(c). In citing to a legal standard that is not relevant to this case (nor relevant to the Court's determination of appropriate equitable remedies), Defendants misstate what the Court must consider to

fashion an appropriate remedy here. As the Bureau outlined in its opening brief, the CFPA empowers the Bureau to seek, and the Court to grant, "any appropriate legal or equitable relief with respect to a violation of Federal consumer financial law." 12 U.S.C. § 5565(a)(1). Here, based on Defendants' violations of the TSR and the CFPA, the Bureau requested, and the Court is empowered to grant, an injunction, rescission of contracts, restitution, and civil money penalties, as appropriate. 12 U.S.C. § 5565(a)(2).

Even if Defendants had cited a correct legal standard by which to determine the appropriate equitable remedies in this case, Defendants should not – as they seem to suggest – be entitled to any restitution offset based on the purported "value" or "benefit" of Defendants' services. Although Defendants contend that they have served as an "advocate" for student loan debtors and allege that consumers have greatly benefitted from enrollment in Defendants' services (Def. Opp'n at 7-8), the reality is that almost since Student Loan Processing.US's inception, consumers enrolled with the Company have complained in droves to government officials and entities such as the Better Business Bureau about Defendants' practices, and have repeatedly alleged that they were misled by Defendants. Pl. UF ¶¶ 178, 179. Moreover, even if Defendants could prove that any of its customers derived a benefit from the Company's student loan debt relief services, Defendants' misrepresentations in inducing consumers to enroll with the Company would prevent such an offset. *See e.g., Figgie*, 994 F.2d at 606 ("The fraud in this selling, not the value of the thing sold, is what entitled consumers in this case to full refunds").

As to the appropriate civil money penalty, Defendants again misstate the law, and allege a burden of proof that is not clearly defined in the statute. Setting Defendants' mischaracterizations of law aside, the Bureau proposed in its opening brief that the maximum civil money penalty for Defendants' "reckless" conduct should be $36,525,000, a figure based upon an estimated 1,461 days that Defendants violated the law between 2012 and 2015. 12 U.S.C. § 5565(c)(2). As the Bureau

previously indicated, although the CFPA has various mitigating factors that the Court must consider in determining the penalty assessed (12 U.S.C. § 5565(c)(3)), three of the five factors should not apply to mitigate the proposed civil penalty. Specifically, as the factual record in this case demonstrates, the violations of Federal consumer financial law in this matter are grave, as Defendants have preyed upon over 5,000 vulnerable consumers, and their actions have caused these consumers to suffer severe financial harm averaging $1000 per consumer. Pl. SJ Ex. 19 (Client List). In addition, Defendants recently settled two state attorneys general actions with Massachusetts and Washington, and have received a significant number of complaints from other state attorneys general, government agencies and nonprofit organizations. *See* Pl. SJ Ex. 40 (Albanese Decl.); Pl. SJ Ex. 41 (Nelson Decl.) at 823-1312; Pl. SJ Ex. 44 (WAAG Judgment); Pl. SJ Ex. 45 (MAAG AOD).

As to the other mitigating factors, size of financial resources and good faith of the person charged, and such other matters as justice may require, Defendants are better positioned to provide the mitigating information. *See Campbell v. United States*, 365 U.S. 85, 96 (1961) (noting that the court does not place the "burden upon a litigant of establishing facts peculiarly within the knowledge of his adversary"). However, the Court should require exacting proof of the Defendants' financial capabilities instead of relying on bald assertions. For instance, even though Mr. Krause claims that he has "never taken a penny in salary from SLP" (Krause Decl. ¶ 39), the Bureau's own review of Company records reveals unexplained checks and American Express charges, which may have been used for Mr. Krause's personal expenses.

## VI. <u>Defendants' Objections To The Bureau's Evidence Are Unfounded</u>

In a separate filing, Defendants object to certain evidence submitted by the Bureau in support of its Motion for Summary Judgment. Dkt. No. 43 ("Def. Obj."). However, all of the evidence to which Defendants object is admissible.

*First*, Defendants object to one portion of Exhibit 23 submitted with the

Bureau's motion – the letter from ED to Mr. Krause concerning the Company's seal and various representations on the Company's website. In that letter, the ED representative states: "A member of the public may easily mistake the [Company's] logo for the Department Seal or assume a relationship between the Department and SLP because of the nature of the logo. In fact, due to this usage the Department has already received such inquiries." Defendants lodge hearsay and foundation objections to the "public . . . inquiries" referenced in this letter. Def. Obj. at 1. The inquiries are not hearsay because they are being submitted to show that ED was put on notice regarding consumer confusion between the ED Seal and the Company's logo. ED's statement also has appropriate foundation; ED was entitled to write to Mr. Krause concerning consumer complaints that ED had received.

*Second*, Defendants object to the consumer complaints attached to the Bureau's Exhibit 40, claiming that the complaints are hearsay. Def. Obj. at 1. However, these complaints are admissible under Federal Rule of Evidence 807, which provides that "a hearsay statement is not excluded by the rule against hearsay" if the statement: (1) "has equivalent circumstantial guarantees of trustworthiness;" (2) "is offered as evidence of a material fact;" (3) "is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts;" and (4) is admitted to "best serve the purposes of these rules and the interests of justice." *See* Fed. R. Evid. 807(a). The Court's "most important inquiry under this Rule is whether the proffered evidence has trustworthiness equivalent to that of the enumerated hearsay exceptions." *Figgie*, 994 F.2d at 608.

The 88 consumer complaints attached to Exhibit 40 satisfy the "circumstantial guarantees of trustworthiness" factor because they were made independently by numerous unrelated members of the public, reported "roughly similar experiences" with Defendants' student loan debt relief services, and were made to different sources. Pl. UF ¶¶ 165, 178; *see also Figgie*, 994 F.2d at 608 (holding that consumer complaints have "circumstantial guarantees of trustworthiness" when they are

submitted by "unrelated members of the public" who report "roughly similar experiences" and "the declarants had no motive to lie"); *FTC v. Ewing*, 2014 WL 5489210, at *2 (D. Nev. Oct. 29, 2014). Statements about the reasons consumers were drawn to enroll with Student Loan Processing.US, consumers' experiences with the student loan debt relief services offered by Defendants, and statements made by consumers about feeling misled are clearly material to the Bureau's case. *See, e.g., Ewing*, 2014 WL 5489210, at *3 (consumer expectation is a material fact). The consumer complaints are also plainly probative; they span several years and capture consumer experiences with Student Loan Processing.US in real time. Lastly, it would be neither practical nor efficient to call all 88 complainants into court to testify. *Id*. at *4 (holding that admitting 162 consumer complaints served the interests of justice because doing so was "the most efficient means of showing the consumers' expectation[s]"). These complaints, many of which were submitted to the Better Business Bureau or state attorneys general, are also admissible pursuant to Federal Rule of Evidence 803 because they are records that are "kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit." Fed. R. Evid. 803(6); *see also Strom v. Nat'l Enterprise Systems, Inc.*, 2010 WL 1533383, at *4 (W.D.N.Y. Apr. 15, 2010) (under Rule 803(6), "records of complaints regularly maintained in the course of business operations by the BBB or state attorneys general are not excluded hearsay evidence").[4]

*Finally*, Defendants object to Exhibits 43-45 submitted by the Bureau, which are court documents related to enforcement actions brought against Mr. Krause and Student Loan Processing.US by the Attorneys General of Washington and

[4] With this reply, the Bureau is submitting a Declaration from Lee Stallings, a representative of the Better Business Bureau Serving Dallas and Northeast Texas, which demonstrates that the complaints submitted to that organization are business records. *See* Pl. SJ Ex. 54.

Massachusetts. Defendants assert that these exhibits are irrelevant because of "different statutory law." Def. Obj. at 2. However, these exhibits are not being offered as precedent binding upon this Court, but rather because they are persuasive authority, similar to a state court decision, state law, or treatise. Specifically, the exhibits contain findings that bear directly on the issues presented in this case, such as whether Defendants provide debt relief services, Mr. Krause's role within the Company, and whether Defendants made misrepresentations in the sale of their services. The Court is entitled to rely upon these exhibits for their persuasive value.

## CONCLUSION

For the foregoing reasons, as well as those set forth in the Bureau's Motion for Summary Judgment, the Bureau respectfully requests that the Court grant the Bureau's Motion for Summary Judgment in its entirety and enter the Proposed Judgment that the Bureau filed with the Court on December 28, 2015.

Dated: January 11, 2016

Respectfully submitted,

David Rubenstein
*Deputy Enforcement Director*
Frank Kulbaski
*Assistant Deputy Enforcement Director*

/s/ Nicholas Jabbour
Nicholas Jabbour, DC Bar #500626
(Email: Nicholas.Jabbour@cfpb.gov)
Rina Tucker Harris, DC Bar #444550
(Email: RinaTucker.Harris@cfpb.gov)
Brandis C. Anderson, CA Bar #261325
(Email: Brandis.Anderson@cfpb.gov)
*Enforcement Attorneys*
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
Phone: (202) 435-7548
Fax: (202) 435-7722

Attorneys for Plaintiff
Consumer Financial Protection Bureau