UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | SACV 14-1967 JVS (ANx) | Date | February 5, 2016 |
| Title | Consumer Financial Protection Bureau v. IrvineWebWorks, Inc., etc., et al. | | |

| | |
|---|---|
| Present: The Honorable | James V. Selna |
| Karla J. Tunis | Not Present |
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

**Proceedings:** **(IN CHAMBERS)** Order GRANTING IN PART and DENYING IN PART Plaintiff's Motion for Summary Judgment & DENYING Defendants' Motion Partial Summary Judgment

Plaintiff Consumer Financial Protection Bureau ("Bureau") moves for an order of summary judgment against Defendants Irvine WebWorks, Inc. d/b/a Student Loan Processing.US ("SLP") and James Krause ("Krause," collectively "Defendants"). (Docket ("Dkt.") No. 34.) Defendants oppose. (Dkt. No. 40.) The Bureau has replied. (Dkt. No. 46.)

Defendants move for an order of partial summary judgment on Count I of the Complaint. (Dkt. No. 33.) The Bureau opposes. (Dkt. No. 38.) Defendants have replied. (Dkt. No. 45.)

As set forth below, the Court denies the Defendants' motion for partial summary judgment. The Court grants in part, and denies in part, the Bureau's motion for summary judgment.

## I. Background

Except where otherwise noted, the following background is based on the Bureau's Statement of Genuine Facts in Dispute as to Defendants' Motion for Partial Summary Judgment, ("GFID," Dkt. No. 39), and the Bureau's Response to Defendants' Statement of Genuine Disputes. ("Response," Dkt. No. 48.) The Bureau transposed the disputes in

Defendant's Statement of Genuine Disputes, (Dkt. No. 42), into the Response. Defendants did not file a response to the Bureau's Statement of Genuine Facts in Dispute. The Court also considers the Defendants' objections to the Bureau's evidence, (Dkt. No. 43.), and the instances where the Bureau objected to Defendants' evidence. (E.g., Response ¶¶ 121–23.)

### A. Student Loan Processing.US

SLP has done business under the name "Student Loan Processing.US" since 2011. (Response ¶¶ 2–3.) Krause has had continuous managerial responsibility over SLP since then. (Id. ¶ 10.) Krause is familiar with SLP's operations and has substantial managerial responsibility and daily control over SLP's operations. (Id. ¶¶ 14–15, 167–177.)

Since July 2011, SLP has marketed and advertised services to advise and assist loan borrowers applying to the U.S. Department of Education ("Department of Education"). (Id. ¶ 22.) SLP purports to "work with" the Department of Education. (Id. ¶ 23.) Since 2011, SLP has charged an enrollment fee for its services. (Id. ¶¶ 30–32.) SLP also charges a recurring monthly fee. (Id. ¶¶ 33–36.) Enrollment for SLP's consumers occurs almost exclusively over the phone, and the means for collecting an enrollment fee (e.g., credit card number) is collected prior to enrollment. (Id. ¶¶ 99, 110–11, 115.)

SLP runs a website to market and advertise its services accessible at three domains with suffixes of either ".us" or ".org." (Id. ¶ 71.) Until August 2012, SLP's website claimed that it "work[s] together with the Department of Education!" and the website did not have a disclaimer that SLP was not affiliated with the Department of Education. (Id. ¶ 130.) SLP also operates social media accounts and pages. (Id. ¶ 76.) Those accounts and pages state SLP works with the Department of Education, and do not include any disclaimers. (Id. ¶ 131.) Some disclaimer was added to SLP's website in September 2012 to state that SLP was not affiliated with the Department of Education. (Id. ¶ 138.) The disclaimer has since been made more prominent on the website. (Decl. Krause Opp'n P.'s Mot. ("Krause Decl. Opp'n") ¶ 29 & Ex. G, Dkt. Nos. 40-1 & 40-8.)

### B. Department of Education Repayment Programs

The Department of Education offers repayment plans to certain borrowers who

have federal student loans. (Response ¶ 16.) Loan consolidation is required for a consumer to access many, but not all, of these plans. (Id. ¶ 18.) If a consumer obtains a consolidation loan from the Department of Education, it is a new loan provided under a new loan agreement. (GFID ¶ 2.)

### C. Student Loan Processing.US's Services

SLP purports to assist consumers identify and apply for various Department of Education repayment plans, ensure proper assignment in federal programs, and help consumers meet recertification requirements. (Response ¶ 28; Decl. Krause Supp. D's Mot. Partial Summ. J. ¶¶ 5–10, Dkt. No. 33-2.) SLP purports to provide the same suite of services regardless of whether the consumer must first obtain a consolidation loan. (Response ¶ 29.)

### D. Student Loan Processing.US's Marketing

SLP markets through direct mail, outbound and inbound telemarketing, a website, print advertising, and customer referrals. (Id. ¶ 40.) The majority of consumers who enrolled have enrolled in response to SLP's direct mailer. (Id. ¶ 42.)

The direct mailer was originally a tri-fold design (the "Tri-Fold Mailer"). (Id. ¶ 45.) The Tri-Fold Mailer contained language highlighting "new" student loan benefits that the consumer was eligible for, and those benefits included "lower monthly payment," "lower interest rates," increased cash flow, and "TOTAL FORGIVENESS in some circumstances." (Id. ¶ 47.) The Tri-Fold Mailer stated that the benefits depended on the student's "current income and ability to pay." (Id. ¶ 48.) The Tri-Fold Mailer claimed there was an "easy qualification process" and directed the consumer to call SLP's toll-free number within 30 days. (Id. ¶ 50.) The Tri-Fold Mailer stated "Official Business" in bold font and contained a citation to U.S. criminal code. (Id. ¶ 125.) The mailer further stated that SLP "works with the Department of Education." (Id. ¶ 127.) The mailer finally stated that the consumer is "now eligible" to receive benefits and that the consumer "must" call SLP within 30 days in order to receive federal benefits. (Id. ¶ 128–29.)

The Tri-Fold Mailer also displayed a logo for SLP (the "First Logo") that included an outer spherical gold border, inner spherical gold border, intermediate blue shading, a

tree growing from a base in the background, an American flag in the foreground, a book at the base in the foreground, and the words "Student Loan Processing .US," and "We Can Help" in white text within the blue shading. (Id. ¶ 140.)

In September 2012, the Tri-Fold Mailer was replaced with a bi-fold mailer (the "Bi-Fold Mailer"). (Id. ¶ 51.) The Bi-Fold mailer retains the same text as the Tri-Fold Mailer. (Id. ¶¶ 54–55.) The Bi-Fold mailer includes a new logo (the "Second Logo"). (Id. ¶¶ 52, 142.)

The Second Logo depicts an outer spherical gold border, inner spherical gold border, intermediate blue shading, two American flags in the background, a gold shield with four symbols (a book, a dollar sign, a mortar board and diploma, and a column), and the words "Student Loan Processing," and "We Can Help" in white text within the blue shading. (Id. ¶ 142.)

SLP's outbound telemarketing includes a script to be read verbatim. (Id. ¶¶ 57–60.) These outbound calls reference "New Federal Forgiveness Programs" that "could possibly lower [the consumer's] monthly payments, interest rate, [] have a large portion of [the consumer's] Federal Student Loans Forgiven," or otherwise "save [the consumer] money on [his/her] Federally Funded Student Loans." (Id. ¶ 61.) If a call results in a voice mail, the script for leaving voice mails references prequalification and free consultation to purportedly discuss how to lower monthly payments, lower interest rates, and have a large portion of student loans forgiven. (Id. ¶ 62.)

SLP's website includes statements such as "See how much money Student Loan Processing.US can save you today!" and sections titled "Debt Relief" and "Loan Forgiveness." (Id. ¶¶ 72–73.) Under one tab of the website, the page includes the statement, "Student Loan Processing provides our clients with personalized advice and guidance on the implementation of federal student debt relief programs tailored to each client's current financial situation." (Id. ¶ 74.)

### E. Student Loan Processing.US's Sales Process

Consumers who enroll with SLP are interested in student loan debt relief services that result in monthly payment amount, lower interest rates, or loan forgiveness. (Id.

¶ 92.) SLP caters to consumers interested in income-based repayment programs, and nearly 70% of consumers who signed up before October 28, 2013 sought to enroll in an income-based repayment plan. (Id. ¶¶ 96–97.) Before that date, nearly 30% sought to enroll in public service or teacher loan forgiveness programs. (Id. ¶ 98.)

SLP and its employees have been using a script for inbound calls since the autumn of 2011. (Id. ¶ 102.) The call involves telling the consumer they are "prequalified" for certain programs, asking questions about the consumers financial situation with the stated goal of finding a repayment plan that results in the "lowest amount of payment" for the consumer. (Id. ¶¶ 103–107.) Early in the call, SLP employees would sometimes tell consumers they "definitely" qualify for a Department of Education repayment plan. (Id. ¶ 147.) The SLP employee then collects information on the consumer's federal student loan balances by asking for the consumer's pin number for the Department of Education's National Student Loan Data System. (Id. ¶¶ 108, 148.) SLP would state it has access to the Department of Education's loan data system but that it needs the consumer to verify their information. (Id. ¶ 148.) SLP had only typical, public access which required the pin number. (Id. ¶ 149.) SLP would also obtain annual income information, and would quote an expected monthly payment amount if the student were to enroll with SLP. (Id. ¶ 108.)

If a consumer elects to enroll with SLP, the employee gathers banking information such as debit/credit card or bank account number during the enrollment call. (Id. ¶ 109.) SLP collects this information, in part, to collect an enrollment fee equivalent to 1% of the consumer's student loan balance. (Id. ¶¶ 30–31.) Some consumers have paid the enrollment fee immediately in one lump sum, but some consumers schedule future payment of the enrollment fee. (Id. ¶¶ 111–112.) Full payment of the fee is always required before SLP mails the application to the consumer and before SLP prepares any paperwork on the consumer's behalf. (Id. ¶ 113.)

All consumers who enroll with SLP sign a service agreement. (Id. ¶ 117.) The original service agreement stated the agreement could "only be modified or amended by a written agreement signed by a corporate officer of SLP and [the Department of Education]." (Id. ¶ 150.) The original service agreement also stated, "[This form] is in accordance with the Department of Education (DOE)" with no other explanation. (Id. ¶ 151.) This service agreement has since been modified. (Compare Pl.'s Summ. J Ex.

("SJ Ex.") 22 with SJ Ex. 21.)

On the call, when SLP employees explain to consumers what they will be expected to pay each month, those consumers are told a dollar amount that reflects both the new monthly payment amount of their loan and the monthly maintenance fee in the monthly payment amount. (Response ¶ 153.) However, the script later directs the employee to separately disclose the recurring monthly maintenance fee. (Id. ¶ 157.)

### F. Complaints and Prior Actions Against Student Loan Processing.US

Consumers have complained to the Bureau and State Attorneys General about SLP. (Id. ¶ 178.) Consumers have also complained to SLP directly about its products and services (Id. ¶ 180.) The State of Washington brought suit, leading to a stipulated judgment against Defendants. (Id. ¶¶ 183–184.) The Commonwealth of Massachusetts has filed an Assurance of Discontinuance related to an investigation of SLP. (Id. ¶¶ 188–190.)

## II. Legal Standard

Summary judgment is appropriate where the record, read in the light most favorable to the nonmovant, indicates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Summary adjudication, or partial summary judgment "upon all or any part of [a] claim," is appropriate where there is no genuine dispute as to any material fact regarding that portion of the claim. Fed. R. Civ. P. 56(a); see also Lies v. Farrell Lines, Inc., 641 F.2d 765, 769 n.3 (9th Cir. 1981) ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim . . . .") (internal quotation marks omitted).

Material facts are those necessary to the proof or defense of a claim, and are determined by referring to substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255. However, when the non-movant's purported evidence or interpretation of events is "blatantly contradicted by the record, so that no reasonable jury

could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007).

The moving party has the initial burden of establishing the absence of a material fact for trial. Anderson, 477 U.S. at 256. "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . ., the court may . . . consider the fact undisputed." Fed. R. Civ. P. 56(e)(2). Furthermore, "Rule 56[(a)][1] mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.

Local Rule 56-3 provides: "In determining any motion for summary judgment or partial summary judgment, the Court may assume that the material facts as claimed and adequately supported by the moving party are admitted to exist without controversy except to the extent that such material facts are (a) included in the 'Statement of Genuine Disputes' and (b) controverted by declaration or other written evidence filed in opposition to the motion."

"A party asserting that a fact cannot be . . . genuinely disputed must support the assertion by citing to particular parts of materials in the records, including . . . affidavits or declarations . . . ." Fed. R. Civ. P. 56(c)(1)(A). However, "an affidavit or declaration used to support . . . a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## III. Discussion

The Complaint recites five counts against Defendants. As to Count I, the parties have filed competing motions for partial summary judgment. Only the Bureau moves for summary judgment on Counts II through V.

[1] Rule 56 was amended in 2010. Subdivision (a), as amended, "carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word: genuine 'issue' becomes genuine 'dispute.'" Fed. R. Civ. P. 56, Notes of Advisory Committee on 2010 amendments.

### A. Count I - Abusive Telemarketing Act or Practice Related to Advance Fees

Both parties move for summary judgment on Count I. Count I alleges a violation of 16 C.F.R. section 310.4(a)(5)(i).[2] In Count I, the Bureau contends that Defendants violated section 310.4(a)(5)(i)(A) by charging an advance fee for its alleged debt relief services. Defendants' sole argument in support of its motion for partial summary judgment—and its opposition to the Bureau's motion for summary judgment—is their theory that the services SLP provides are not "debt relief services" as that term is defined by 16 C.F.R. part 310 (The "Telemarketing Sales Rule"). (D.'s Mem P&A Supp. Mot. Partial Summ. J. 10–12, Dkt. No. 33-1; D's Opp'n Mot. Summ. J. 9–12, Dkt. No. 40.)

The Telemarketing Sales Rule contains a definition section. The definition of "debt relief service" is:

> "any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors or debt collectors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector."

[2] "It is an abusive telemarketing act or practice and a violation of this Rule for any seller or telemarketer to engage in the following conduct: . . . Requesting or receiving payment of any fee or consideration for any debt relief service until and unless: (A) The seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer; (B) The customer has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor or debt collector; and (C) To the extent that debts enrolled in a service are renegotiated, settled, reduced, or otherwise altered individually, the fee or consideration either: (1) Bears the same proportional relationship to the total fee for renegotiating, settling, reducing, or altering the terms of the entire debt balance as the individual debt amount bears to the entire debt amount. The individual debt amount and the entire debt amount are those owed at the time the debt was enrolled in the service; or (2) Is a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration. The percentage charged cannot change from one individual debt to another. The amount saved is the difference between the amount owed at the time the debt was enrolled in the service and the amount actually paid to satisfy the debt." 16 C.F.R. § 310.4(a)(5)(i).

16 C.F.R. § 310.2(m). However, according to Defendants, this is not the last word on "debt relief services."

Defendants point to footnote 123 in the Federal Trade Commission's comments on the 2010 amendments to the Telemarketing Sales Rule. Footnote 123 states that the final rule differed from the proposed rule by the addition of the word "program" to the definition of "debt relief service", and that

> "regardless of its form, anything sold to consumers that consists of a specific group of procedures to renegotiate, settle, or in any way alter the terms of a consumer debt, is covered by the definition. **The definition is not intended, however, to cover services or products that offer to refinance existing loans with a new loan as a way of eliminating the original debts, as such a process would result in a new extension of credit that replaces the existing debts rather than altering them.**"

Telemarketing Sales Rule, 75 Fed. Reg. 48458 at 48466 n.123 (Aug. 10, 2010) (codified at 16 C.F.R. pt. 310) (emphasis added).

Defendants contend that the overwhelming majority of their customers are, in fact, extended Department of Education consolidated loans. Moreover, it is undisputed by the parties that Department of Education consolidated loans are entirely new loans. Therefore, Defendants argue that the term "debt relief services" does not cover the services offered by SLP by virtue of this exception in footnote 123.

The Bureau makes three principal arguments in response. First, the Bureau argues SLP represented that it provides a service to renegotiate, settle, or alter terms of student loan debt—SLP claimed in its marketing materials that it was performing a textbook "debt relief service." Even if some—or nearly all—of SLP's consumers received a loan consolidation, SLP marketed a service that purported to do much more than merely consolidate loans.

The Bureau's second point is that SLP has offered services to certain customers who never receive a consolidated loan from their interaction with SLP. (See SJ Ex. 37 p. 494 (SLP's 30(b)(6) Deposition) ("Q: Do you offer services to consumers who have already consolidated their loan into a direct consolidation loan? A: Yes.").) In these

instances, the service was allegedly "getting [consumers] into a better plan than they are already in." (Id.) In these limited instances, SLP charged the same advanced fee to its customers. (Response ¶ 114.) The Bureau argues that this is convincing evidence that the suite of services SLP purports to offer is more than simple loan consolidation.

Defendants' response to the Bureau's second point is that many of these consumers who had previously consolidated actually received "re-consolidation" loans. (Krause Decl. Opp'n ¶ 25.) Also, other consumers who were purportedly assisted by SLP and who did not receive a consolidation loan were only clients "who asked SLP for such specific help after contacting SLP about consolidation and finding we could not help them with a new [Department of Education] loan." (Id.)

However, the Bureau's third argument responds to these assertions. The Bureau states that the purported exemption mentioned in footnote 123 only applies where the "product or service being offered is a new extension of credit, and nothing more." (P.'s Opp'n Mot. Partial Summ. J. 6, Dkt. No. 38.) In other words, an entity falls under the footnote 123 exemption only if the entity is itself extending credit—and is not acting as a negotiator for the consumer or acting as a purveyor of additional debt relief services.

The Court finds this interpretation of "debt relief services" and footnote 123 compelling for several reasons. First, the definition section of the Telemarketing Sales Rule describes "debt relief service" in broad terms. Second, the comments made by the FTC in the promulgation of the Telemarketing Sales Rule confirm the intent for the Telemarketing Sales Rule to cover entities that engage in practices substantially similar to those of loan consolidation middlemen.[3] Third, providing an exemption from the

[3] For example, the FTC indicated that fees in the debt relief context frequently cause serious injury. Telemarketing Sales Rule, 75 Fed. Reg. at 48484–5 ("In many cases, providers misrepresent or fail to disclose material aspects of their programs, causing consumers to make payments to the providers for several months, not realizing that most of the payments go towards fees, rather than settlement offers.") Although this Order does not conclude that as a matter of law Defendants completely failed to adequately disclose material aspects of their service, should the Bureau prevail at trial this case would be a textbook example of just such a problem in the Defendants' industry because the uncontroverted evidence establishes that Defendants would not complete their assistance of the consumers' loan consolidation for its customers until the entire advance fee was paid to SLP. (Response ¶¶ 30–31; SJ Exs. 21–22.) See also Telemarketing Sales Rule, 75 Fed. Reg. at 48461–48464 (discussing generally the

Telemarketing Sales Rule for entities who actually extend credit to retire unsecured loans makes sense. Those entities take on the risk of future default, removing a burden of risk that concerned the FTC. Those entities would also, presumably, be regulated under statutes and regulations particular to creditors. E.g. 15 U.S.C. § 1601, et seq. Finally, and most importantly, the plain language of footnote 123 appears to this Court to limit the exemption's scope only to the actual extension of new credit where it recites, "such a process would result in a new extension of credit"—implying that the "process" is the "new loan" previously mentioned in the footnote.

At the hearing, counsel for Defendants reiterated their argument that the FTC did not intend the Telemarketing Sales Rule to cover a service, like SLP, that facilitates a consumer obtaining new credit via a consolidated loan. Defendants argued that this was particularly the case where, as here, consumers are virtually guaranteed to obtain some debt relief—unlike other purported debt relief services. See Telemarketing Sale Rule, 75 Fed. Reg. at 48462–63, 48482–83 (advance fees cause consumers to drop out, and many consumers do not attain results close to what was represented).

However, although SLP's service does not cause all of the potential consumer harms identified by the FTC, the service could cause many of those harms and the service is substantially the same as the services that the FTC expressly attempted to regulate through the advance fee ban. For example, the FTC was concerned that in many instances consumers were not aware that the fees paid were not being saved for settlement of their debt, causing already financially distressed consumers to fall further behind on all of the consumer's debts. Id. at 48463, 48484 ("charging advance fees . . . impedes the goal of debt relief."). In enacting the advance fee ban, the FTC was also concerned about sales tactics that are exemplified by SLP, such as contracts of adhesion that include grants of power of attorney. Id. at 48485. Additionally, the FTC was concerned with consumers not understanding what services the advance fee was paying for. Id. at 48487 ("Consumers are unlikely to know that the services do not benefit most consumers who enroll and that they are at significant risk of losing the large sums of money they pay in advance fees."). Here, SLP charged a fee that was usually in excess of the monthly fee

FTC's concerns with debt settlement services and debt negotiation services).

that debtors already struggled to pay,[4] and SLP would not assist the consumer in obtaining a lower monthly payment until this entire advance fee was paid.[5] As a result, consumers were uninformed that they could obtain the exact same debt relief more expeditiously, and without paying an advance fee, simply by filling out the Department of Education's forms themselves.[6] Some reasonable consumers could also have been led to believe that the "enrollment fee" was an initial cost of the consolidation loan itself and not for the services SLP offered in helping obtain the loan. See SJ Ex. 55, 38:13–38:45 (SLP's employee explaining the advance fee and claiming that SLP was "required to collect 1% of the total student loan amount"). For all of these reasons, the Court concludes that the policies behind the FTC's promulgation of the advance fee ban apply to cover a service such as SLP.

Defendants also contend that the Court's construction of Footnote 123 is awkward and does not comport with what they consider the plain language of the regulation. The Court disagrees. Instead, absent this proper construction of the final sentence of footnote 123, the remainder of the footnote would not make sense. The regulation is quite clear: "anything sold to consumers that consists of a specific group of procedures to renegotiate, settle, or in any way alter the terms of a consumer debt, is covered by the definition." (Telemarketing Sales Rule 75 Fed. Reg. at 48466 n.123). The carve out for "new loans" means that persons who extend new credit are not covered because an extension of new credit is not a "group of procedures." SLP does not extend credit, its service consists of procedures[7] to assist consumers in acquiring a Department of Education consolidated loan.

With the correct scope of "debt relief services" resolved, deciding the competing

[4] (Response ¶ 30.)

[5] (Response ¶ 113.)

[6] (Response ¶¶ 19–20.)

[7] I.e., intake of consumer information, purportedly analyzing a consumers debt situation, purportedly researching debt restructuring options, purportedly ensuring that the information is correct, mailing of physical documents to consumer for their review and signature, and mailing those documents to the Department of Education. (Response ¶¶ 26–27, 113.)

summary judgment motions as to Count I is straightforward. There is no genuine dispute that Defendants represent that they provide debt relief services. (Response ¶¶ 27, 61, 64, 72–75, 77–81, 84–85, 94, 127–128.) There is no dispute that Defendants charged a fee, and indeed collected a fee, prior to submitting any documents to the Department of Education on behalf of every consumer. (Id. ¶¶ 111, 113–114.) These two undisputed facts establish liability as to Defendants on Count I of the Complaint.

Consequently, the Bureau is entitled to summary judgment, and the Court accordingly grants summary judgment for the Bureau, on Count I of the Complaint. The Defendants' motion for partial summary judgment is denied.

**B. Count II**

Count II alleges Defendants violated 16 C.F.R. section 310.3(a)(2)(vii).[8] The Bureau argues that Defendants violated section 310.3(a)(2)(vii) by creating the false impression that Defendants were affiliated with, endorsed by, or sponsored by the Department of Education.

Here, the Bureau argues that some of Defendants' advertisement and scripted telephone calls convey the impression of affiliation with the Federal Government. The Bureau says that (1) the ".US" suffix in SLP's name and URL implies an association; (2) the phrase "works with the Department of Education" is artfully ambiguous and implies an affiliation; (3) the mailers' use of the phrase "Official Business" and citation to U.S. Code threatening imprisonment implies some affiliation with the government; (4) SLP's logos are strikingly similar to the Department of Education's seal; and (5) phrases like "prequalified" imply that it is SLP that qualifies applicants for the Department of Education loans.

Defendants respond that, based on the summary judgment standard, this is a claim

[8] "It is a deceptive telemarketing act or practice and a violation of this Rule for any seller or telemarketer to engage in the following conduct: . . . Misrepresenting, directly or by implication, in the sale of goods or services any of the following material information: . . . A seller's or telemarketer's affiliation with, or endorsement or sponsorship by, any person or government entity." 16 C.F.R. § 310.3(a)(2)(vii)

that must be tried to a jury. The Court agrees. On summary judgment, the Court does not make factual findings, and only finds for a summary judgment movant on a factual issue if no reasonable jury could conclude otherwise. However, the present case presents a genuine dispute because the cited indices of affiliation can be interpreted in more than one way.

The cases cited by the Bureau are not very analogous. In F.T.C. v. Think Achievement Corp., 144 F. Supp. 2d 993 (N.D. Ind. 2000) ("Think Achievement I"), aff'd, 312 F.3d 259, 261 (7th Cir. 2002) ("Think Achievement II"), the court granted summary judgment in favor of the FTC on its claim that corporations engaged in deceptive practices, in part, because the court found that defendants made "false representations to consumers" by misleading consumers into believing there was affiliation or endorsement by the U.S. Postal Service and utilized advertisements and sales scripts to convey an impression of governmental affiliation. Think Achievement I, 144 F. Supp. at 1011–12. See also Think Achievement II, 312 F.3d at 261("It is rare for a judge to enter summary judgment in favor of the plaintiff in a fraud case, but in this case the evidence was so overwhelming as to justify the district court in dispensing with a trial."). But among the evidence that the Seventh Circuit considered "so overwhelming" as to justify summary judgment was plenty of evidence that had nothing to do with supposedly misleading impressions of affiliation. See Think Achievement I, 144 F. Supp. 2d at 1012 (other evidence included use of corporate forms to attempt evasion of injunctions and settlement agreement, objectively false statements about availability of jobs in particular geographic areas, objectively false guarantees of test scores, misrepresentations about how quickly jobs could be obtained, and false statements about "unconditional" money-back guarantees). Here, when viewing the evidence in the light most favorable to the nonmovant, the Court cannot conclude that, as a matter of law, Defendants committed the specific act of misrepresenting an affiliation with the government. A jury should weigh such evidence.[9]

The Bureau cites additional cases where courts in this circuit have found for the government on similar claims on a motion for summary judgment. The Court finds these

[9] The Bureau also cites FTC v. Federal Loan Modification Law Center, LLP, No. 09-00401-CJC(MLGx) (C.D. Cal. Nov. 17, 2010) (order granting summary judgment). That case was decided without the benefit of a filed opposition.

cases distinguishable. In F.T.C. v. Cyberspace.com LLC, 453 F.3d 1196 (9th Cir. 2006), the Ninth Circuit affirmed the entry of summary judgment against an internet service provider who issued checks for $3.50 that, on fine print on the back of the check, committed the depositor to a contract for internet service upon cashing or depositing such check. Id. at 1199–1201. A misleading offer of money in a form that looks like a normal check, as in Cyberspace.com LLC, is a deceptive trade practice very different from the Bureau's theory of this case. In F.T.C. v. Gill, 71 F. Supp. 2d 1030 (C.D. Cal. 1999), the court entered summary judgment against an attorney and former attorney who made false statements about defendants' abilities to, for example, remove anything on a credit report. Id. at 1043–44. Here, the Bureau has not pointed to any statement made by the Defendants that are objectively false, only statements it contends are misleadingly ambiguous.[10] There is a triable issue of fact as to whether any particular statement by the Defendants, or all the statements and other acts together, imply an affiliation with the Department of Education.

Unlike the misrepresentation and deception cases cited by the Bureau, the theory presented in this case requires a weighing of evidence more akin to a "likelihood of confusion" analysis that is usually not suitable for summary judgment. See Interstellar Starships Services, Ltd, v. Epix, Inc., 184 F.3d 1107, 1109 (9th Cir. 1999) ("Because of the intensely factual nature of trademark disputes, summary judgment is generally disfavored in the trademark arena."). While this case is not a trademark dispute, the undisputed facts in this case merely invite an inference in favor of the Bureau; they do not compel that result.

With regard to the specific evidence cited by the Bureau, Defendants argue that the .US domain name does not imply a connection with the federal government because it is not the .gov domain name. (Krause Decl. Opp'n ¶ 31.) Although the mailers use the

[10] At the hearing, counsel for the Bureau suggested that statements in SLP's voicemail script that a consumer is "prequalified" is objectively false. (See Response ¶ 146.) Also, counsel suggested statements that SLP could "definitely" be able to help a consumer obtain federal benefits were false. (Id. ¶ 147, SJ Ex. 15.) Finally, counsel suggested that the mailer's indication that the consumer "must call [SLP] within 30 days to receive these federal benefits" was objectively false. (Response ¶ 129, SJ Exs. 1–2.) In the commercial mailing context, the Court does not consider these statements to be deceptively false as a matter of law in a way that falsely implicates an affiliation with the government, although each of them could be evidence towards such a finding.

phrase "Official Business" and refer to the anti-mail tampering statute, this Court cannot declare that these statements are deceptive as a matter of law. The Court also notes that the phrase "Official Business" should be read in the context of the entire contact and the fact that it appears right above an address for SLP at "25381 Commercentre" is at least some evidence to counter whatever weight the phrase "Official Business" provides for the Bureau's position. (SJ Ex. 1.) The Bureau's concerns about the First Logo and the Second Logo exemplify why Defendants' citation to Interstellar Starships's discussion of summary judgment is not irrelevant. Finally, marketing and sales pitches that use phrases like "works with the Department of Education" and "prequalified" are ambiguous phrases, not outright falsehoods.

Further, there is at least some evidence of disclaimer. On or around September 2012 Krause added text to the website disclaiming an affiliation with the Department of Education. (Response ¶ 138.) At some date since then, the disclaimer has been made more prominent. (Krause Decl. Opp'n ¶ 29 & Ex. G.) The mere existence of a disclaimer does not bar liability, Gill, 71 F. Supp. 2d at 1044, but in this case the jury should be the fact finder to weigh its effect.

Taken together, there is sufficient evidence for a factual finding that SLP misrepresents an affiliation with the Government—but making such finding is a task for the jury, not the Court. On this motion for summary judgment the Court must view the evidence in the light most favorable to the Defendants. Accordingly, the Court denies the Bureau's motion for summary judgment on Count II.

## C. Count III

Count III alleges Defendants violated 16 C.F.R. sections 310.3(a)(1)(i)[11] &

[11] "It is a deceptive telemarketing act or practice and a violation of this Rule for any seller or telemarketer to engage in the following conduct: Before a customer consents to pay for goods or services offered, failing to disclose truthfully, in a clear and conspicuous manner, the following material information: The total costs to purchase, receive, or use, and the quantity of, any goods or services that are the subject of the sales offer" 16 C.F.R. § 310.3(a)(1)(i).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | SACV 14-1967 JVS (ANx) | Date | February 5, 2016 |
| Title | Consumer Financial Protection Bureau v. IrvineWebWorks, Inc., etc., et al. | | |

(a)(2)(i).[12] The Bureau argues that Defendants violated both sections 310.3(a)(1)(i) and 310.3(a)(2)(i) by failing to adequately disclose the monthly maintenance fee and by obfuscating what the total cost of the service would be.

The Bureau argues that conduct by the Defendants has the net effect of misrepresenting the cost of the Defendants' services. Specifically, the Bureau contends that Defendants, (1) combine the monthly fee with the estimated loan payment to give the impression that the combined amount will be remitted to the Department of Education; and (2) state in the service agreement the aggregated cost as an "Estimated New Monthly Cost." The Bureau further contends that Defendants never accurately disclose the total cost of the service because Defendants never inform the consumer as to how many monthly fees the consumer may incur.

The Defendants dispute all of these characterizations. The Defendants cite to a portion of the scripted call in which the consumer is specifically told that the monthly fee exists, that it costs $39 per month, and that it is included in the previously cited number. (SJ Exs. 11–13.) Additionally, consumers who are interested in the service receive an "SLP Service Agreement package" that states, "monthly cost is based upon SLP monthly maintenance fee of $39.00 and the Estimated DOE payment." (Krause Decl. Opp'n P.'s Mot. Summ. J. Ex. D; SJ Ex. 22.)[13] That language is also included in the service agreement. Finally, Defendants argue that the total cost is adequately disclosed because the service agreement that the consumer signs states that the monthly maintenance fee will be charged monthly until the loan is paid in full or discharged. (See Krause Decl. Opp'n ¶ 15 & Ex. D; SJ Exs. 21–22.)[14] Defendants further contend this language is also

[12] "It is a deceptive telemarketing act or practice and a violation of this Rule for any seller or telemarketer to engage in the following conduct: . . . Misrepresenting, directly or by implication, in the sale of goods or services any of the following material information: The total costs to purchase, receive, or use, and the quantity of, any goods or services that are the subject of a sales offer" 16 C.F.R. § 310.3(a)(2)(i).

[13] (See also SJ Ex. 21 (current service agreement breaks out "cost to [Department of Education]" and "$39.00 to SLP equals total: __").)

[14] (But see SJ Ex. 55 at 54:30–54:50 (SLP employee only ambiguously telling consumer that the new monthly payment "does include everything . . . consolidation loan as well as everything to service it throughout the life of the loan . . ."). Also, compare SJ Ex. 12 ("new" script stating that SLP employee

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 14-1967 JVS (ANx) | Date | February 5, 2016 |
|---|---|---|---|
| Title | Consumer Financial Protection Bureau v. IrvineWebWorks, Inc., etc., et al. | | |

read to the consumer verbatim on the phone. (Krause Decl. Opp'n ¶ 15.)

Once again, on a motion for summary judgment, the Court does not weigh conflicting evidence and is directed to view the evidence in the light most favorable to the nonmovant. This case is distinguishable from the cases cited by the Bureau because at least some record evidence[15] tends to show the disclosures regarding the monthly fees are made more prominently, and more timely, than the inadequate disclosures in FTC v. Gill, and FTC v. E.M.A. Nationwide, Inc., 767 F.3d 611 (6th Cir. 2014). In Gill, the court found it significant the disclosures defendant could point to were not included with the deceptive representations that formed the basis of the F.T.C.'s suit. 71 F. Supp. 2d at 1043–44. Similarly, in E.M.A. Nationwide, the Sixth Circuit held that a district court, ruling on summary judgment, need not look past the first contact with a consumer to determine the "net impression" from that contact. 767 F.3d at 632. However, here, where there is a genuine dispute as to whether the discussion of the supposedly misleading total monthly payment takes place in the same contact as disclosures of the $39 monthly fee, the rule set forth in Gill and E.M.A. Nationwide does not decide the case. The Court concludes that the overall impression created by the contact is a question of fact that the Court should not resolve on summary judgment.[16] Consequently, the Court denies summary judgment on the Bureau's claim that Defendants violate 16 C.F.R. section 310.3(a)(2)(i).

However, 16 C.F.R. section 310.3(a)(1)(i) contains a bright line rule susceptible to summary adjudication. The regulation indicates that certain adequate disclosures must be made before the consumer consents to pay for goods and services. At the hearing, counsel

must read necessary disclosures and certain paragraphs of the service agreement) with SJ Ex. 11 (no such instruction to SLP employee).)

[15] (E.g. SJ Exs. 11–12 (inbound call script); SJ Exs. 21–22 (service agreement); Krause Decl. ¶ 15.)

[16] Because the consumer declarations submitted by the Bureau, e.g., SJ Exs. 46–51, conflict with portions of the inbound call script, SJ Ex. 11–12, the service agreement, SJ Ex. 21–22, and the Krause Declaration, to favor this evidence over the evidence cited by Defendants would require a weighing of evidence inappropriate on the Bureau's motion for summary judgment. See Anderson, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions.").

for the Bureau cited certain federal guidance for what actions constitute "consent to pay" for purposes of this rule. Specifically, "sending full or partial payment; **providing credit card, bank account or other billing information**, stating agreement to a transaction, or invoking an electronic process used to electronically sign an agreement" all constitute consent to pay for purposes of this regulation. Telemarketing Sales Rule, 75 Fed. Reg. at 48496 (emphasis added). The purpose of this rule is to ensure that consumers understand what services they are paying for, and how much those services cost, before they signify their consent to pay for these services with banking information.

It is irrelevant that there is a genuine dispute as to whether Defendants actually collect payment prior to adequate disclosure. Uncontroverted evidence shows that Defendants asked for the consumer's credit card or banking information before Defendants ever disclose that the services they purport to provide cost $39 per month. (Response ¶ 157, SJ Exs. 11, 13. See also SJ Ex. 55 at 40:00–55:00, 59:05–59:14.) Defendants contend that its employees disclose the total amount consumers will be responsible for (inclusive of SLP's fee), and thus they also satisfy 16 C.F.R. section 310.3(a)(1)(i). (D.'s Supplemental Brief 2–3, Dkt. No. 58.) The Court disagrees. As a matter of law, it is not "clear and conspicuous" to simply add the cost of SLP's services to the monthly payment on the loan, and then disclose the total amount as a total payment. Consumers are not told what portion of the total payment goes to their loan payment and what portion of their payment will go to SLP for its purported services until after they supply banking or credit card information (if they are ever, in fact, made clearly aware of this distinction).

Defendants also argue that the provision of banking information only constitutes "consent to pay" in the context of outbound telemarketing calls. (D.'s Supplemental Brief 4–5.) The Court disagrees. The Telephone Sales Rule indicates there is a distinction between outbound and inbound telemarketing calls in certain contexts,[17] but that distinction is not made in the portion of the regulation that the Defendants violated.

Defendants' final argument is that the Telemarketing Sales Rule is impermissibly vague and that the rule failed to give Defendants fair notice of what conduct was prohibited or when Defendants could request banking or credit card information. The

[17] (See, e.g., 16 C.F.R. §§ 310.2(v), 310.4(b))

Court disagrees. The regulation was properly published and promulgated prior to the conduct that the Bureau contends violated the Telemarketing Sales Rule. This is not an example of a federal agency changing its position, and imposing a penalty for previously acceptable conduct, without notice. Cf. F.C.C. v. Fox Television Stations, Inc., 132 S. Ct. 2307, 2317–18 (2012).

Consequently, the Court holds that the uncontroverted evidence establishes that Defendants violated 16 C.F.R. section 310(a)(1)(i). There is a genuine dispute of material fact whether Defendants violated 16 C.F.R. section 310(a)(2)(i). The Bureau is entitled to partial summary judgment, and the Court accordingly grants partial summary judgment for the Bureau, on Count III of the Complaint.

### D. Counts IV and V

Counts IV and V both allege Defendants violated the Consumer Financial Protection Act ("CFPA"), 12 U.S.C. § 5536(a)(1)(B). Section 5536(a)(1)(B) prohibits certain "covered persons" from engaging in deceptive acts or practices. The Bureau argues that Defendants violated section 5536(a)(1)(B) when Defendants created the net impression that Defendants were affiliated with the Department of Education, and violated section 5536(a)(1)(B) when Defendants misrepresented and failed to clearly disclose the total cost of Defendant's services.

As a threshold matter, the standard for "deceptive" conduct under 12 U.S.C. section 5536 is a similar, if not identical, standard as has been applied in the context of the Federal Trade Commission Act. Consumer Fin. Prot. Bureau v. Frederick J. Hanna & Assocs., P.C., 14-cv-2211, _ F. Supp. 3d. _, 2015 WL 4282252, at *20 (N.D. Ga. July 4, 2015); Illinois v. Alta Colleges, Inc., 14 C 3786, 2014 WL 4377579, at *4 (N.D. Ill. Sept. 4, 2014). See also Consumer Fin. Prot. Bureau v. ITT Educ. Servs., Inc., _ F. Supp. 3d _, 14-cv-292, 2015 WL 1013508, at *17–18 (S.D. Ind. Mar. 6, 2015), appeal docketed, No. 15-1761 (7th Cir. Apr. 8, 2015).

Under interpretation of section 5(a) of the Federal Trade Commission Act, the agency, in order to prove a deceptive act or practice, must show (1) a representation, omission or practice that, (2) was likely to mislead consumers acting reasonably under the circumstances, and (3) the representation, omission, or practice was material. FTC v.

Stefanchik, 559 F.3d 924, 928 (9th Cir. 2009) (quoting FTC v. Gill, 265 F.3d 944, 950 (9th Cir. 2000)). The agency is not required to show that all consumers were deceived; rather, the agency must show that marketing material included "misrepresentations in a manner likely to mislead reasonable consumers." Stefanchik, 559 F.3d at 929, n.12 ("The existence of some satisfied customers does not constitute a defense under the FTCA.").

FTC v. Stefanchik also discusses the summary judgment standard. 559 F.3d at 927–29. The Ninth Circuit held the district court's entry of summary judgment was appropriate because the defendants "did not offer any consumer declarations, contrary survey information, or other evidence" tending to show that certain representations made by Defendants were true. Id. at 927. However, here, Defendants submit declarations and point to record evidence (often the same record evidence as the Bureau) that they contend establishes a genuine dispute of material fact about the correct inferences and implications to draw from the circumstantial evidence cited by the Bureau. Although the Court need not credit parties' contentions when those contentions are "blatantly contradicted by the record," Scott v. Harris, 550 U.S. 372 (2007), the theories of this case and the record established to support those theories are not well-suited to blatant contradiction.

Both Counts IV and V allege that the conduct alleged in Counts II and III also constitute violation of the CFPA respectively. The applicable standard for "deceptive act or practice" is stated more generally than the specific violations of the Telemarketing Sales Rule. Nevertheless, the outcomes should be the same. If there is a genuine dispute over the material facts underlying the respective claims, then summary judgment must be denied. Based on the analysis in Sections III.B and III.C, *supra*, the Court holds that there remains a genuine issue of material fact as to Counts II and IV, but Defendants failed to show there is a genuine issue of material fact as to Counts III and V.

## IV. Conclusion

For the foregoing reasons, the Court denies the Defendants' motion for partial summary judgment. The Court grants in part, and denies in part, the Bureau's motion for summary judgment as follows: The Court grants summary judgment on Count I, III, and V of the Complaint and denies summary judgment on Counts II and IV.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | SACV 14-1967 JVS (ANx) | Date | February 5, 2016 |
| Title | Consumer Financial Protection Bureau v. IrvineWebWorks, Inc., etc., et al. | | |

IT IS SO ORDERED.

: 00

Initials of Preparer kjt